## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

Christina A. Cummings, on behalf of the SandRidge Energy, Inc. 401(k) Plan, herself, and, alternatively, a class consisting of similarly situated participants of the Plan,

      Plaintiff,

v.

SANDRIDGE ENERGY, INC., MARY L. WHITSON, ROBERT SCOTT GRIFFIN, JOHN DOES 1-10, and RELIANCE TRUST COMPANY,

      Defendants.

Case No.: CIV-15-892-M

**JURY TRIAL DEMANDED**

**COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT**

Plaintiff Christina A. Cummings ("Plaintiff"), on behalf of the SandRidge Energy, Inc. 401(k) Plan (the "Plan"),[1] herself, and, to the extent necessary, a class of similarly situated participants of the Plan (the "Participants"), for her Complaint, states as follows:

### INTRODUCTION

1.    Plaintiff, a Participant in the Plan during time periods relevant to the Complaint, brings this action under Section 502(a) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a), for Plan-wide relief based upon the Plan's purchases and holdings of shares of common stock of SandRidge Energy, Inc. ("SandRidge" or the "Company") common stock ("SandRidge Stock") or units of any

---

[1] An iteration of the Plan's governing document (the "Plan Document") was filed as Exhibit 10.1 to a January 1, 2008 Form S-1 filed with the Securities and Exchange Commission (the "SEC"). The Plan Document is cited to herein as "Plan § ___".

SandRidge Common Stock Fund ( "Fund")[2] from November 8, 2012 to the present, inclusive (the "Relevant Period").[3]   This action is brought derivatively, for Plan-wide relief for breaches of fiduciary duty, pursuant to § 502(a)(2) of ERISA, 29 U.S.C. § 1132(a)(2).   As more fully set forth below, Defendants breached their ERISA fiduciary duties, including those fiduciary duties set forth in Section 404, 29 U.S.C. § 1104, and Department of Labor Regulations, including 29 C.F.R. § 2550.

2.     In the alternative, Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23(a) and Fed. R. Civ. P. 23(b)(1) and/or (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following class of persons similarly situated (the "Class"):

> All Participants for whose individual accounts the Plan held shares of SandRidge Stock or Fund units during the Relevant Period.

3.     The Plan is a legal entity that can sue and be sued.   ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1).   However, in a breach of fiduciary duty action such as this, the Plan is not a party.   Instead, pursuant to ERISA § 409, the relief requested in this action is for the benefit of the Plan.

4.     401(k) plans confer tax benefits to incentivize retirement savings.   An employee participating in a 401(k) plan may have the option of purchasing the common

---

[2] Fund units and SandRidge common stock in the Plan are used interchangeably herein, except when discussing price fluctuations in SandRidge Stock.

[3] Plaintiff reserves his right to seek to modify the Relevant Period if discovery reveals a more appropriate period.   *See, e.g., Lively v. Dynegy*, No. 05-CV-00063, 2007 WL 685861, at *6 (S.D. Ill. Mar. 2, 2007) ("the proper termination date of the proposed class period is the date when Dynegy stock ceased to be, as Plaintiff alleges, an imprudent investment for the Plan").

stock of their employer, often the plan's sponsor, for part of their retirement investment portfolio.  SandRidge Stock was one of the investment alternatives of the Plan throughout the Relevant Period.

5.     Plaintiff alleges that Defendants, Plan "fiduciaries" pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached duties owed to the Plan and its Participants by, *inter alia*, retaining SandRidge Stock as a Plan investment option when a reasonable fiduciary using the "care, skill, prudence, and diligence … that a prudent man acting in a like capacity and familiar with such matters would use" not have done so.  *See* ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1).

6.     Plaintiff alleges in Count I that Defendants, each having certain responsibilities regarding the management and investment of the Plan's assets, breached their fiduciary duties to the Plan, to them, and the proposed Class by: (a) continuing to offer SandRidge Stock as a Plan investment option when it was imprudent to do so; and (b) maintaining the Plan's pre-existing significant investment in SandRidge Stock when it was no longer a prudent investment for the Plan.  These actions/inactions run directly counter (a) to the express purpose of ERISA pension plans, which are designed to help provide funds for participants' retirement (*see* ERISA § 2, 29 U.S.C. § 1001 ("CONGRESSIONAL FINDINGS AND DECLARATION OF POLICY")) and (b) the purpose of the Plan (*i.e.*, to help Participants save for retirement).

7.     Count II alleges that SandRidge breached its fiduciary duties by failing to adequately monitor persons to whom management/administration of the Plan's assets was delegated, despite the fact that SandRidge knew or should have known that such other

fiduciaries were imprudently allowing the Plan to continue offering SandRidge Stock as an investment option, and investing the Plan's assets in SandRidge Stock when it was imprudent to do so.

8.     Plaintiff's Count III alleges that Reliance Trust Company ("Reliance") breached its fiduciary duties by blindly following the directions of the Plan's named fiduciaries, in violation of ERISA, when it was clearly imprudent to do so.  Reliance continued to allow the Plan to hold and acquire SandRidge Stock when it was clear, based upon publicly available information, that SandRidge Stock was an objectively imprudent retirement savings vehicle.

9.     The thrust of Plaintiff's allegations is Defendants allowed imprudent investment of the Plan's assets in SandRidge Stock throughout when Defendants knew or should have known that SandRidge Stock was an imprudent retirement savings vehicle because, after staking its future on an "exploration play" while taking on large amounts of debt and issuing shares, such that it had higher financial risks than its risky peers (including considerable leverage and that it was outspending its cash flow), SandRidge Stock essentially became a gamble that oil prices would rebound before the Company ran out of cash.  As analysts and shareholders questioned the Company's trajectory (noting that bankruptcy risk was priced into the stock), as SandRidge's bonds traded at steep discounts reflecting the likelihood of bankruptcy, and with ratings agencies noting a high probability of default, one analyst stated of SandRidge "Right now, they don't have a leg to stand on."  Indeed, while hedges have masked the Company's losses, those hedges are running out and the Company's prospects are dim, and the Company has, as noted below,

gone "*to desperate lengths to reduce debt and try to put its finances on a sounder footing.*"

10.     In 2015, in-the-money hedges accounted for a 64% of SandRidge's first-quarter revenue.  But SandRidge's reliance on hedges was unsustainable; while a year prior SandRidge could hedge for prices in the high $80s, by early 2015 it could only hedge in the low $60s, a level for which it had acknowledged its debt was too high. While hedges tentatively staved off bankruptcy for SandRidge, the future looked bleak: as one expert opined, by July of 2015 SandRidge's forward looking 12 month default probability sat at 22.89%, up ~5% from an early-June reading of ~17.5% and up exponentially from an early-May reading of under 5%:

11.     As a consequence of the foregoing (as described in significantly more detail below), and under the circumstances as they existed in the market at the time, no reasonably prudent ERISA fiduciary would have concluded that SandRidge Stock was a sufficiently prudent investment for Participants' retirement savings, and no reasonably prudent ERISA fiduciary would have maintained the Plan's investment in SandRidge Stock as a result of the tremendous risk of what became essentially a gamble that oil prices would rise significantly before SandRidge's liquidity dried up.

12.     Defendants knew or should have known that significant investment of Participants' retirement savings in Company Stock would was unduly risky and unreasonably likely to result in substantial losses to the Plan and, consequently, to the Participants.

13.     Defendants recognized or should have recognized the severity of the crisis at SandRidge during the Relevant Period but, while trying to save the Company, took no steps to protect the Plan as conditions worsened, or alternatively waited until it was far too late for such changes to make any meaningful difference.

14.     ERISA requires fiduciaries to employ appropriate methods to investigate the merits of all plan investments and to engage in a reasoned decision-making process, consistent with that of a prudent person acting in a like capacity.  ERISA's duty of prudence requires fiduciaries to monitor the prudence of their investment decisions to ensure that the investments remain in the best interest of a plan's participants.  A fiduciary who simply ignores changed circumstances that have increased the risk of loss to the trust's beneficiaries is imprudent.

15.     Prudent investment management demands, *inter alia*, that Defendants not merely rely upon the fact that SandRidge Stock's price remained above $0 and that it had not filed for bankruptcy in determining whether investing in Company Stock was appropriate for the Plan.  ERISA required Defendants to scrutinize the risk of continued Plan investment in SandRidge Stock—based upon, *inter alia*, the public information upon which the stock price was based and the risk inherent therein—to protect the Participants' retirement savings.

16.     Besides its price, which has plummeted drastically and steadily before and during the Relevant Period, trading for less than a dollar at times during 2015, SandRidge Stock was and is an imprudent investment for the Plan, as shown herein.

17.    Even if it may have been a reasonable investment for some investors, ERISA requires fiduciaries to avoid taking excessive risk with retirement assets.  After all, "the duties of prudence and loyalty embodied in [ERISA § 404(a)(2)] have been characterized as the 'highest known to law.'"  *See, e.g.*, *Shannahan v. Dynegy, Inc.*, No. 06-cv-0160, 2006 WL 3227319, at *4 (S.D. Tex. Nov. 6, 2006) (quoting *Sommers Drug Stores Co. Employee Profit Sharing Trust v. Corrigan*, 793 F.2d 1456, 1468 (5th Cir. 1986)).

18.    Evaluating the prudence of an investment decision requires a totality-of-the-circumstances inquiry taking into account the character and aim of the particular plan and decision at issue and the circumstances prevailing at the time.  The Plan, which was meant to be a vehicle for retirement savings, required less risky and objectively prudent investments.

19.    The Plan was intended to assist Participants in accumulating benefits for retirement.  Trust Law, from which ERISA is derived, cautions that "[t]he duty of care requires the trustee to exercise reasonable effort and diligence in planning the administration of the trust, in making and implementing administrative decisions, and in monitoring the trust situation, ***with due attention to the trust's objectives and the interests of the beneficiaries***."   Restatement (Third) of Trusts § 77, Comment b (emphasis added).

20.    The Participants had every right under ERISA to expect—and did expect—that the Plan's fiduciaries would act in their interest and protect them from unduly risky investments, whether in Company Stock or any other asset.

21.     Moreover, at least some of the Defendants, given the facts described herein, failed to provide the Participants information necessary to make informed decisions regarding SandRidge Stock.   Plaintiff does not allege that SandRidge Stock was artificially inflated because of the withholding of such information, but rather that SandRidge, as the Plan's administrator and named fiduciary, had a duty under ERISA to disclose that information, cause the Plan to cease purchasing SandRidge Stock, cause the Plan to divest of unduly risky investments in SandRidge Stock, and/or take other steps as necessary and appropriate to avoid the Plan's massive losses.

22.     By apparently conducting no investigation, analysis, or review of whether it was prudent to continue investment in SandRidge Stock in the Plan, Defendants acted procedurally imprudently.   Had Defendants conducted a prudent evaluation the appropriateness of SandRidge Stock for the Plan during the Relevant Period and taken protective action as described below, Participants would not have suffered such devastating losses to their retirement savings.

23.     This action is brought on behalf of the Plan and seeks recovery of the losses to the Plan for which Defendants are liable because of their actions or lack thereof.  *See* ERISA §§ 409 and 502, 29 U.S.C. §§ 1109 and 1132.  Given the totality of circumstances prevailing during the Relevant Period, no prudent fiduciary would have made the same decision to retain the clearly imprudent SandRidge Stock as a Plan investment or to allow Participants to continue investing their retirement savings in SandRidge Stock.

## JURISDICTION AND VENUE

24. ***Subject Matter Jurisdiction.***    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

25. ***Personal Jurisdiction.***   This Court has personal jurisdiction over all Defendants because they are all residents of the United States and ERISA provides for nation-wide service of process pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).

26. ***Venue.***  Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan is administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district, and one or more Defendants reside or may be found in this district.

## PARTIES

### Plaintiff

27.    Plaintiff Christina A. Cummings is a former SandRidge employee.  She is a "participant" in the Plan, within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7), and held shares of SandRidge Stock in her retirement investment portfolio during the Relevant Period.

### Defendants

#### The Company

28.    Defendant SandRidge is an oil and natural gas company that operates in three business segments: exploration and production, drilling and oil field services, and midstream services. The exploration and production segment explores for, develops and

produces oil and natural gas in the Mid-Continent. The drilling and oil field services segment performs services for third parties, including third-party working interests in wells that it operates. The midstream services segment is engaged in gas marketing. The Company focuses on exploration and production activities in the Mid-Continent region of the United States. It also operates businesses and infrastructure systems, including gas gathering and processing facilities, marketing operations, a saltwater disposal system, an electrical transmission system and a drilling rig and related oil field services business. As of December 31, 2014, the Company's drilling rig fleet consisted of 25 operational rigs. The Company is incorporated in Delaware and maintains its principal place of business at 123 Robert S. Kerr Avenue, Oklahoma City, OK 73102.

29.     SandRidge sponsored the Plan.  Plan Introduction.  SandRidge was also the Plan Administrator and Named Fiduciary of the Plan.  Plan § 1.02.

30.     Plan § 4.01 required, *inter alia*, that

> At least annually, the Named Fiduciary shall review all pertinent Employee information and Plan data in order to establish the funding policy of the Plan and to determine appropriate methods of carrying out the Plan's objectives. The Named Fiduciary shall inform the Trustee and any Investment Manager of the Plan's short-term and long-term financial needs so the investment policy can be coordinated with the Plan's financial requirements.

31.     SandRidge, as the Plan's Named Fiduciary, was responsible for ensuring all investment options offered under the Plan were prudent and suitable for retirement savings.  As the Plan's Form 11-K Annual Report filed with the SEC on June 24, 2015

(the "2015 11-K") states, "Participants may direct contributions into one or more of the available investment options, including a self-directed brokerage account." (*Id.* at 6.)

### The Individual Defendants

32.    The 2015 11-K states that "The Plan is administered by designated Company personnel."  *Id.* at 7. Upon information and belief, Defendant Mary L. Whitson, SandRidge's Senior Vice President, Corporate and Human Resources, who signed certain of the Company's Relevant Period Forms 11-K and 5500 on behalf of SandRidge as Plan Administrator, was one such person who was designated to act and did act on behalf of the Company..

33.    The 2015 11-K states that "The Plan is administered by designated Company personnel."  *Id.* at 7. Upon information and belief, Defendant Robert Scott Griffin, SandRidge's Senior Vice President, Human Resources, who signed certain of the Company's Relevant Period Forms 11-K and 5500 on behalf of SandRidge as Plan Administrator, was one such person who was designated to act and did act on behalf of the Company.

### "John Doe Defendants"

34.    The 2015 11-K states that "The Plan is administered by designated Company personnel."  *Id.* at 7. To the extent that SandRidge officers, directors, and employees were fiduciaries of the Plan during the Relevant Period, including members of any committee(s) that acted on SandRidge's behalf and any such committee(s) themselves, Plaintiff reserves the right, once their identities are ascertained, to seek leave to join them to the instant action.  Thus, without limitation, unknown "John Doe"

Defendants 1-10 include other individuals, including, but not limited to, Company officers, directors, and employees, and committee(s) who were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Relevant Period.

35.     The 2015 11-K also states that "[t]he Company has engaged an investment consultant to assist in (i) selecting appropriate and prudent investment options and (ii) monitoring and evaluating performance results of the investment options to assure that the investment objectives applicable to the investment options are being met."  2015 11-K at 7.  To the extent that such investment consultant reviewed and had discretion over the Fund, Plaintiff reserves the right, once its identity is ascertained, to seek leave to join it to the instant action.

**Trustee Defendant**

36.     Defendant Reliance Trust Company maintains an office at 2100 McKinney Avenue, Suite 1510, Dallas, TX 75201.  Reliance was the Plan's trustee and held Plan assets in trust, and a fiduciary of the Plan because it exercised discretionary authority or control over Plan management and/or authority or control over management or disposition of Plan assets.

**THE PLAN**

37.     The 2015 11-K sets out the following Description of the Plan:

> *General*
>
> The Plan is a defined contribution plan covering all eligible employees of SandRidge Energy, Inc. and its subsidiaries (collectively, the "Company" or "Employer").  Employees

must be at least 21 years of age and complete two consecutive months of service with the Company in order to be eligible to participate in the Plan. Eligible employees may begin participating on the first day of the first plan quarter after satisfying the Plan's eligibility requirements. Employees qualifying as eligible rehired participants may begin participating in the Plan immediately. The Plan is subject to the provisions of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and is qualified under Section 401(a) of the Internal Revenue Code of 1986, as amended (the "Code").

### *Contributions*

Participant Contributions. Eligible employees may contribute a percentage of their pretax compensation to the Plan through a payroll deduction program. The Code and Plan Agreement limit discretionary employee contributions to an annual amount, which is adjusted for inflation under the Code.

Participants may direct contributions into one or more of the available investment options, including a self-directed brokerage account.

Company Contributions. The Company determines the matching contribution to be made to the Plan by the Company for each plan year on the first day of that plan year. For the plan year ended December 31, 2014, the Company made matching contributions to the Plan equal to a dollar for each dollar contributed by the participant up to 10% of the participant's eligible compensation (excluding performance bonuses) for each payroll period. For a participant's performance bonus, the Company made dollar for dollar matching contributions to the Plan up to 15%. Company contributions are deposited with the Plan at least annually. During 2014, the Company's contributions to the Plan were made at the same time as the bi-weekly participant contributions.

Company matching contributions are invested entirely in shares of the Company's common stock. After one year of service, participants may transfer amounts allocated to their accounts from the Company's matching contribution to other investment options available under the Plan and may change

their future match allocation to other available investment options. See "Vesting" below.

In addition to Company matching contributions, the Plan permits the Company to make profit sharing contributions at its discretion. Any profit sharing contribution made by the Company shall be allocated to eligible employee accounts in proportion to the employee's compensation as a percentage of total compensation of all eligible employees and will vest based on years of service pursuant to the Plan Agreement. The Company made no profit sharing contributions during 2014.

### Payment of Benefits

The Plan provides for payments of benefits to participants or their beneficiaries (i) upon a participant's attainment of age 60, (ii) in the event of a participant's death, (iii) in the event a participant becomes permanently disabled or (iv) in the event a participant age 59 ½ or older elects to receive in-service distributions.

\* \* \*

### Participant Accounts

Each participant's account is credited with the participant's discretionary contributions and earnings thereon and an allocation of the Company's contributions and earnings thereon. Each participant is entitled to the fully vested portion of the participant's account. The amount of benefits to which a participant is entitled is determined as of the date a participant's distribution is processed.

\* \* \*

### Plan Administration

The Plan is administered by designated Company personnel. Reliance Trust Company (the "Trustee") is designated as the Plan's trustee and has delegated responsibility for the custody and management of the Plan's assets to Fidelity Investments (the "Custodian") and The Newport Group (the "Record Keeper"), respectively. The Company has engaged an investment consultant to assist in (i) selecting appropriate and

prudent investment options and (ii) monitoring and evaluating performance results of the investment options to assure that the investment objectives applicable to the investment options are being met. The Company provides administrative and managerial services to the Plan at no charge. Investment expenses charged to the Plan are paid out of Plan assets or by the Company.

38.     Despite the problems alleged herein, the Fund acquired hundreds of thousands of shares of SandRidge Stock during the Relevant Period and lost tens of millions of dollars of Participant's retirement savings as a result of Defendants' fiduciary breaches.  As shown by the Forms 11-K filed on behalf of the Plan, the Plan's holdings during the Relevant Period were:

| SandRidge Holdings | $ held in Fund | Share Price at Year-End | Approximate shares Held at Year-End | Depreciation During Calendar Year |
|---|---|---|---|---|
| Year End 2012 | $28,484,906.00 | 6.35 | 4,485,811.97 | |
| Year End 2013 | $31,797,586.00 | 6.07 | 5,238,482.04 | ($1,150,734.00) |
| Year End 2014 | $9,427,679.00 | 1.82 | 5,180,043.41 | ($20,714,835.00) |
| TOTAL: | | | | ($21,865,569.00) |

**Plan Fiduciaries Are Bound By ERISA's Strict Standards**

39.     Despite the Plan's substantial investment in SandRidge Stock, Defendants failed to protect the Plan and its Participants from the decline in value of Company Stock resulting from the extreme risk inherent in Company Stock detailed below.  Defendants not only continued to have the Plan hold shares of SandRidge Stock, they compounded the problem and the Plan's losses by having the Plan purchase additional shares during the Relevant Period.

40.     Fiduciaries of retirement plans such as the Plan are bound by core ERISA fiduciary duties, including the duties to act loyally, prudently, and for the exclusive purpose of providing benefits to plan participants.  This is true regardless of the structure of the plan, including whether the plan is styled as an ESOP.

41.     Accordingly, if the fiduciaries of a plan know, or if an adequate investigation would reveal, that company stock is no longer a prudent investment for that plan, then the fiduciaries must disregard any plan direction to maintain investments in such stock and protect the plan by investing the plan assets in other, suitable, prudent investments.

## ALTERNATIVE CLASS ACTION ALLEGATIONS

42.     As noted above, Plaintiff brings this action derivatively pursuant to § 502(a)(2) and (3) of ERISA, 29 U.S.C. § 1132(a)(2) and (3).  Alternatively, Plaintiff brings this action as a class action pursuant to Rules 23(a), (b)(1)(B) and/or (b)(3) of the Federal Rules of Civil Procedure, on behalf of the Class defined in paragraph 2.

43.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, the Plan's 2014 Form 5500 tax return lists 2,351 Participants with account balances as of December 31, 2013 and 2,294 Participants with account balances as of December 31, 2014.  There are thus thousands of Class members.

44.     Common questions of law and fact exist as to all members of the Class, which predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to all members of the Class are:

(a)     Whether Defendants were Plan fiduciaries;

(b)     Whether Defendants breached their fiduciary duties to the Plan, Plaintiff and/or the members of the Class;

(c)     Whether the Plan and the Participants were injured by such breaches; and

(d)     Whether the Plan and the Participants are entitled to damages and/or injunctive relief.

45.     Plaintiff's claims are typical of the claims of the other members of the Class, as Plaintiff and all other members of the Class sustained injury arising out of Defendants' wrongful conduct in breaching their fiduciary duties and violating ERISA as complained of herein.

46.     Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has retained able counsel with extensive experience in class action ERISA litigation.   The interests of Plaintiff are coincident with and not antagonistic to the interests of the other members of the Class.

47.     Prosecution of separate actions by Participants would create a risk of inconsistent adjudications with respect to individual members of the Class which could establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the Class would, as a practical matter, be dispositive of the

interests of the other members or substantially impair or impede their ability to protect their interests.

## DEFENDANTS' FIDUCIARY STATUS

48.     ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan."  ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

49.     ERISA treats as fiduciaries not only persons explicitly named as such by a Plan document, but also any other persons who in fact perform fiduciary functions (*e.g.*, *de facto* or functional fiduciaries).  Thus, a person acts as a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan."   ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

50.     During the Relevant Period, upon information and belief, each of the Defendants was a fiduciary—*i.e.* either a named fiduciary or a *de facto* fiduciary—with respect to the Plan and owed fiduciary duties to the Plan and its Participants under ERISA.  As fiduciaries, Defendants were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plan, and the Plan's investments solely in the interest of a plan's participants and with the care, skill, prudence, and diligence under the

circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

51.    Plaintiff does not allege that each Defendant was a fiduciary with respect to all aspects of the Plan's management and administration.  Rather, as set forth below, Defendants were fiduciaries to the extent of the specific fiduciary discretion and authority assigned to or exercised by each of them, and, as further set forth below, the claims against each Defendant are based on such specific discretion and authority.

52.    Instead of delegating all fiduciary responsibility for the Plan to external service providers, the Company assigned fiduciary tasks to the Individual and Doe Defendants.

53.    ERISA permits fiduciary functions to be delegated to insiders without an automatic violation of the rules against prohibited transactions, ERISA § 408(c)(3), 29 U.S.C. § 1108(c)(3), but insider fiduciaries, like external fiduciaries, must act solely in the interest of participants, not in the interest of the plan sponsors.

54.    During the Relevant Period, all of Defendants acted as fiduciaries of the Plan pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), and the law interpreting that section.

**The Company's Fiduciary Status**

55.    As noted above, the Company was the Plan Administrator and Named Fiduciary of the Plan.  Plan § 1.02.  The Company thus exercised discretionary authority or control respecting management of the Plan or exercised discretionary authority or

control respecting management or disposition of Plan assets and had discretionary authority or responsibility in the administration of the Plan, and was a fiduciary as defined by ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A),  The Company is also liable for the breaches of fiduciary duty of the other Defendants under ERISA Section 405, 29 U.S.C. § 1105.

## The Individual Defendants' and Doe Defendants' Fiduciary Status

56.    As noted above, the 2015 11-K states that "The Plan is administered by designated Company personnel." *Id.* at 7.  By administering the Plan, these designated Personnel exercised discretionary authority or control respecting management of the Plan or exercised discretionary authority or control respecting management or disposition of Plan assets and had discretionary authority or responsibility in the administration of the Plan, and were fiduciaries, as defined by ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A),

57.    The Individual Defendants and Doe Defendants are also liable for the breaches of fiduciary duty of the other Defendants under ERISA Section 405, 29 U.S.C. § 1105.

## The Trustee's Fiduciary Status

58.    A directed trustee cannot blindly follow directions of other fiduciaries; it is an ERISA fiduciary and has a duty to ''supervise'' and ''investigate'' the directions it receives from a plan's named fiduciary when it has ''some reason to know'' that the directions may conflict with ERISA or a plan's terms. Pursuant to ERISA Section

403(a)(1), 29 U.S.C. § 1103(a)(1), a directed trustee may only follow "proper directions" that are ''not contrary to ERISA.''

59.     Because Reliance, during the Relevant Period, knew or should have known that SandRidge was unduly risky for retirement savings, it had a fiduciary duty to protect the Participants and the Plan from the continued imprudent investment in SandRidge Stock.

**Additional Fiduciary Aspects of Defendants' Actions/Inactions**

60.     ERISA plan fiduciaries have a duty of loyalty to a plan and its participants which includes the duty to speak truthfully to plans and their participants when communicating with them.  "[L]ying is inconsistent with the duty of loyalty owed by all fiduciaries and codified in section 404(a)(1) of ERISA."  *Varity Corp. v. Howe*, 516 U.S. 489, 506 (1996).

61.     Moreover, an ERISA fiduciary's duty of loyalty requires the fiduciary to correct the inaccurate, incomplete or misleading information so that plan participants will not be injured.

62.     During the Relevant Period, upon information and belief, Defendants made direct and indirect communications to Participants, including statements regarding investments in Company Stock.  These communications included, but were not limited to, SEC filings, annual reports, press releases, and Plan documents (including SPDs and/or prospectuses regarding Plan/participant holdings of Company Stock), which included and/or reiterated these statements.

63.     Plaintiff does not herein allege that SandRidge's SEC filings were fiduciary communications.  However, as the Solicitor General and the Solicitor of Labor asserted in their Brief for the United States as *Amicus Curiae* in *Fifth Third Bancorp v. Dudenhoeffer*, No. 12-751 (the "*Fifth Third Amicus*"),[4] the incorporation of SEC filings into a SPD can be actionable under ERISA.  *Id.* at 20-23; *accord Rinehart v. Akers*, 722 F.3d 137, 152 (2d Cir. 2013) (overruled in part on other grounds) (persons "act[] as ERISA fiduciaries when they incorporate[] [an employer's] SEC filings into the SPD distributed to plan-participants.")  Thus, Defendants acted as fiduciaries to the extent they communicated with Participants about all Plan investments.

64.     In their communications to the Participants, given the facts described herein, Defendants failed to provide the Participants information necessary to make informed decisions regarding SandRidge Stock.  Plaintiff does not allege that SandRidge Stock was artificially inflated because of the withholding of such information, but rather that Defendants had a duty under ERISA to disclose that information, cause the Plan to cease purchasing and holding SandRidge Stock, and/or take other steps as necessary and appropriate to avoid massive Plan losses.

65.     Further, Defendants, as the Plan's fiduciaries, knew or should have known that, *inter alia*, employees are biased towards employer stock in retirement plans; employees tend to over-extrapolate from recent returns; 401(k) plan participants tend to not change their investment options; the conventional wisdom is that it is highly risky to

---

[4] *Available at*: www.dol.gov/sol/media/briefs/dudenhoffer(A)-11-01-2013.pdf

invest anything beyond a modest amount of retirement savings in employer securities, and that the risks inherent to company stock are not commensurate with its rewards.

66.    Even though Defendants knew or should have known these facts, and even though Defendants knew of the substantial investment of the Plan's assets in Company Stock, they still took no action to protect the Plan's assets from their imprudent investment in SandRidge Stock.

67.    What is important is not whether SandRidge's executives and officers, including the fiduciaries of the Plan, were optimistic about the Company's future—as could be expected in their corporate capacity—but whether it was reasonable for them, when acting in a fiduciary capacity, to allow the Participants to invest their retirement savings in the Company's future as the Company's problems expanded and its prospects dimmed.

### FACTS BEARING UPON DEFENDANTS' FIDUCIARY BREACHES

**Overview & Background**

68.    On February 1, 2012, SandRidge announced that it had entered into an agreement to acquire Dynamic Offshore Resources, LLC ("Dynamic") for aggregate consideration of $1.275 billion consisting of approximately $680 million in cash and approximately 74 million shares of SandRidge common stock valued at $8.02 per share.

69.    On February 4, 2012, SandRidge reported a net fourth-quarter 2011 loss of $389 million, or 97 cents a share, nearly double what the company lost in the same period of 2010. The Company still reported net earnings of $52 million for 2011.

70.     On April 2, 2012, SandRidge announced that, conditioned upon its pending acquisition of Dynamic, it would commence a private offering of $750 million of Senior Notes due 2022, with proceeds used to finance the approximately $680 million payable in connection with the acquisition and remaining net proceeds to be used for general corporate purposes.

71.     On May 4, 2012, *Wichita Business Journal* reported in an article entitled "SandRidge Energy beats Q1 expectations, plans more Mississippian rigs" that:

> SandRidge Energy Inc., an Oklahoma-based oil and gas company that has begun drilling in south central Kansas, reported improved earnings for the first quarter of 2012, as oil production increased 33 percent.
>
> The Oklahoman reports the producer had a net loss for the quarter of $232 million, but excluding one-time earnings, the company had a net income of $21.2 million.
>
> SandRidge CEO Tom Ward says the company's focus has been on the Mississippian oil play, which covers much of Oklahoma and Kansas, and that it plans to nearly double its number of rigs there by the end of 2013.

72.     Throughout the Relevant Period, as described in great detail below, while, experts and analysts saw little to no hope for the oil markets to rebound, SandRidge hemorrhaged money, and divested assets to maintain the liquidity necessary to survive long enough to ride out what it hoped was a short-term market cycle.[5] The Company's results relied entirely upon unsustainable (and rapidly unavailable) oil hedges:

---

[5] Even assuming, *arguendo*, that these hopes are objectively reasonable for the Company and its executives *qua* executives, they were unreasonable for ERISA fiduciaries when acting in their fiduciary roles.

| $ Millions | Quarterly Net Income (Loss) | Yearly Net Income (Loss) | Profit from Hedges[6] | Yearly Net Income (Loss) Removing Hedges |
|---|---|---|---|---|
| Q4'2012 | -$287.90 | $141.57 | $241.4 | ($99.83) |
| Q1'2013 | -$479.34 | | | |
| Q2'2013 | -$20.44 | | | |
| Q3'2013 | -$81.45 | | | |
| Q4'2013 | $19.08 | -$553.89 | -$47.1 | ($506.79) |
| Q1'2014 | -$136.34 | | | |
| Q2'2014 | -$24.44 | | | |
| Q3'2014 | $157.34 | | | |
| Q4'2014 | $265.18 | $253.29 | $334.0 | ($80.71) |
| Q1'2015 | -$1,034.95 | | | |
| Q2'2015 | -$1,368.482 | | | |

73. Notably, as of the start of the Relevant Period, SandRidge Stock had not been performing well. Defendants should have been attuned to its prudence as a retirement savings vehicle. SandRidge was off approximately 25% on the year, and had



performed poorly historically:

Source: https://www.google.com/finance?q=SD (showing SandRidge's trading post-IPO)

---

[6] As noted in its Feb. 27, 2015 Form 10-K, "The Company recorded (gain) loss on commodity derivative contracts of $(334.0) million, $47.1 million and $(241.4) million for the years ended December 31, 2014, 2013 and 2012, respectively, as reflected in the accompanying consolidated statements of operations, which includes net cash payments (receipts) upon settlement of $32.3 million, $(0.8) million and $(91.4) million, respectively.

**November of 2012 through 2014: Oil Prices Fall Drastically From Record Highs, And SandRidge's Prospects Dim as its Leverage and Debt are Unsustainable**

74.     On November 8, 2012, *Dow Jones Newswire* reported in an article entitled

"3rd UPDATE: SandRidge Swings to 3rd-Quarter Loss, Considers Asset Sales" that:

> Hours after a major investor publicly rebuked SandRidge Energy Inc.'s (SD) management and strategy, the company reported that its production and revenue grew during the third quarter, but heavy losses on derivatives caused a net loss for the quarter.
>
> SandRidge reported a loss of $170.4 million, or 39 cents a share, compared with a year-earlier profit of $575.1 million, or $1.16 a share. The latest quarter included a $193.5 million loss on derivative contracts, compared with a $596.7 million gain a year earlier. Excluding derivative impacts and other items, earnings rose to five cents a share from one cent a year ago.
>
> Revenue rose 46.5% to $532.8 million.
>
> Analysts polled by Thomson Reuters were expecting the company to break even on a per-share basis, with revenue of $539 million.
>
> Earlier Thursday, SandRidge's board was sent a letter by shareholder TPG-Axon Capital seeking an overhaul of the oil-and-gas company's board and management.
>
> The investment firm, which holds 4.5% of SandRidge's outstanding shares, praised SandRidge's assets but said the company has been mismanaged.
>
> "A company must sensibly budget for the full cost of exploration and development, and not leave itself in a position where they fall short and are at the mercy of markets. SandRidge never seems to learn this lesson," Dinakar Singh, founder and chief executive of TPG-Axon wrote in the letter. He wrote that SandRidge has been too willing to issue high-cost debt and dilute shareholder value by issuing equity to fund its activity.

26

* * *

TPG-Axon accused SandRidge management of being "been incoherent, unpredictable and volatile, amplifying uncertainty regarding the future course of the company."

TPG-Axon also claims that "poor strategic planning and reckless spending have resulted in repeated 'financial emergencies.'"

TPG-Axon maintains that SandRidge stock "has been a disastrous performer" and "the single worst-performing energy stock in the U.S. market." It added the stock is down 76% since its initial public offering in 2007 and is off by more than 91% from its 2008 peak.

The firm claims that on a standalone basis, fair value for SandRidge stock is $12 a share to $14 share, a level last attained in April 2011.

SandRidge said in response that it disagreed with a number of points in the letter but said it expects to "engage substantively with shareholders" after it releases its third-quarter financial report Thursday.

75.     On November 8, 2012, *Dow Jones News Service* reported in an article entitled "MARKET TALK: SandRidge Revenue, Cash and Debt Grew in Q3" that:

Some items in SandRidge Energy (SD)'s third quarter earnings report are bound to soothe investor ire. The company is reporting that its revenue is up 46% and cash generated by operating activities is more than twice as high as in the third quarter of last year, jumping from $64,081 a year ago to $166,524 this year. ***But debt -- a major investor complaint -- is also growing. The company's debt stands at $4.3 billion as of Sept 30, up from $2.8 billion a year ago.*** [emphasis added]

76.     On November 9, 2012, *The Wall Street Journal*'s BLOG reported in an article entitled "SandRidge Shares Stumble After It Puts Permian Fields on the Block" that:

SandRidge Energy executives this morning seemed to soothe investors — somewhat.

The Oklahoma City energy producer's shares tumbled 20% in early trading Friday after the company released mixed third-quarter results and surprised investors by announcing plans to sell its Permian Basin oil fields Thursday evening. The stock has rebounded some, recently trading 9% lower to $5.55.

Plan for the Permian fields in west Texas were revealed hours after SandRidge received a scathing letter from an activist investor that one analyst likened to "getting a subpoena on your birthday."

Much of the analyst and investor consternation this morning focused on the divestiture plans. SandRidge has previously touted it Permian fields, comprised of 225,000 acres that produce the equivalent of more than 24,000 barrels of oil a day, as core assets.

Simmons & Company International analysts said the fields could raise upward of $2.4 billion to **reduce SandRidge's leverage and "ensure sufficient funding" through 2014**. Still the proposed sale "comes as a significant surprise and is yet another transformational shift" that the analysts suspect will leave investors "scratching their head."

Howard Weil analyst Pete Kissel pegged a similar value on the assets and wrote in his own note that they would likely "intrigue" master limited partnerships and private-equity buyers. But he also noted that the decision to sell the assets **"yet again points to a change in strategy" at SandRidge.**

"We believe investors are looking to gain comfort that management can settle into execution mode with the existing portfolio, something that will not happen as long as the portfolio is always changing," Kissel said.

TPG-Axon Capital Chief Executive Dinakar Singh, who penned Thursday's activist letter, voiced similar complaints about SandRidge's strategy: **"Management strategy has been incoherent, unpredictable, and volatile, amplifying uncertainty regarding the future course of the company."**

Singh, whose firm owns about 4.5% of SandRidge's stock, called for a board shake-up, the ouster of Chief Executive and founder Tom Ward and the hiring of bankers to help SandRidge explore a sale of all or parts of the company.

Ward said this morning that the decision to sell SandRidge's Permian oil fields was not a reaction to the letter from TPG-Axon, which he called "an important shareholder."

***Proceeds from a sale will be used to shore up SandRidge's balance sheet by paying down some of the company's $4.3 billion in debt and help fund development of SandRidge's million-acre-plus position in the Mississippi Lime oil fields in Kansas and Oklahoma, Ward said.***

"I think it's an extraordinary package of assets that will bring a premium," Ward said.

***Ward was pressed by analysts Friday morning who wondered why SandRidge wanted to shed some of its most profitable wells rather than parting with the Gulf of Mexico fields the company acquired earlier this year in a $1.28-billion cash-and-stock deal that flummoxed investors.***

His reply: The Permian Basin is hot, with recent deals netting big prices for land in long-producing oil patch, while Gulf of Mexico properties are selling for a discount, which was his rationale for buying the offshore fields in the first place.

Analysts with Tudor, Pickering, Holt & Co. wrote that ***it's "hard to rationalize strategy of selling high margin oil" to fund Mississippi Lime development. However, Duane Grubert of Susquehanna Financial Group, who made the subpoena quip, offered one rationale: "Increased single-basin focus, arguably makes SandRidge more saleable."*** [emphasis added]

77.     On or about November 13, 2012, Deutsche Bank cut their target price on shares of SandRidge from $9.00 to $5.00.  Analysts at Canaccord Genuity had cut their price target on shares of SandRidge from $6.00 to $4.00 in a research note the prior day.

78.     On November 16, 2012, *The Daily Oklahoman* reported in an article entitled "Another investor for Oklahoma City-based SandRidge Energy calls for change" that:

> The heat on SandRidge Energy Inc. is rising.
>
> Another large institutional investor is questioning the company's leadership, calling for the ouster of CEO Tom Ward and changes to SandRidge's board.
>
> "We believe that -- properly managed -- the company's assets are worth approximately $20 per share," Mount Kellett Capital Management LP wrote Thursday in a letter to SandRidge's board. "Unfortunately, all we see now are critical failures of management and board oversight. "SandRidge has not merely failed to even remotely maximize the potential of its assets, but it has destroyed stockholder value."
>
> Mount Kellett is the second SandRidge investor in a week to call for change at the Oklahoma City-based oil company. TPG-Axon urged the company to replace Ward and some of its board members in a Nov. 8 letter.
>
> "Lest the board believe that TPG-Axon's concerns are isolated ones, we are writing to add our views and be crystal clear that management and the board cannot ignore the interests of the company's stockholders any longer," wrote Jonathan Fiorello, Mount Kellett's chief operating officer.
>
> * * *
>
> "In the interim, we urge the board not to take any hasty strategic actions, such as the precipitous sale of the Permian assets, which will permanently impair stockholder value," according to the letter. "The company has no immediate financing needs and there is no need to sell assets at fire-sale prices."
>
> * * *

SandRidge ***took on significant debt and nearly tripled its share count in its shift to focusing on crude oil***, Morningstar analyst Mark Hanson said in a Nov. 9 report on the company. [emphasis added]

79.    On December 5, 2012, the Company and certain of its officers and directors were accused of securities fraud.  A press release announcing the filing states:

The complaint alleges that, during the Class Period, defendants issued materially false and misleading statements regarding the Company's operational status and financial projections. Specifically, according to the complaint, defendants misrepresented and/or failed to disclose the following adverse facts, among others: (a) that they had been overstating the value of SandRidge's Mississippian formation assets throughout the Class Period as contrary to their repeated mantra that SandRidge had successfully transformed itself from a primarily natural gas to a primarily oil producing company, when in reality its Mississippian formation assets consisted of significantly higher low-margin natural gas deposits and significantly lower high-margin oil deposits than the market had previously been led to believe; (b) mechanical issues with one of three rigs the Company needed to drill in its new Gulf of Mexico assets acquired in the Dynamic Offshore Resources LLC acquisition in early 2012 rendered that rig inoperable during the second quarter of 2012, requiring that defendants ramp down drilling in the Gulf of Mexico; (c) that contrary to their Class Period statements, defendants intended that the $1.3 billion Dynamic Offshore acquisition be utilized as a "financing vehicle" for the Company's onshore drilling projects; and (d) that as a result, defendants knew SandRidge's fiscal year 2012 earnings guidance was not attainable.

The Complaint further alleges that defendants shocked the market between November 8, 2012, after the close of trading, and November 9, 2012, before the opening of trading, by disclosing that they had been grossly overstating the proportion of oil-producing versus natural gas producing assets in the Company's Mississippian formation throughout the Class Period. Defendants also disclosed that they intended to sell the remaining interest in the Company's Permerian

Basin assets, though those assets were the Company's highest-margin oil producing assets.

On this news, SandRidge's stock fell precipitously from its November 8, 2012 closing price of $6.10 per share to close at $5.51 per share on November 9, 2012, or 9%, on extremely high volume of more than six times the average daily trading volume over the prior three month period.

80.    On December 19, 2012, *The Business* reported in an article entitled "SandRidge Energy to sell some Permian Basin sites" that:

SandRidge Energy Inc. is selling its Permian Basin properties in Texas to privately held Houston oil and gas company Sheridan Production Partners for $2.6 billion in cash.

Oklahoma City-based SandRidge is selling off some of its assets as it transitions from a natural gas company to one focused more on oil.

SandRidge plans to use proceeds to reduce debt and strengthen its balance sheet.

The deal is expected to close in the first quarter of 2013.

81.    On February 5, 2013, SandRidge was downgraded by JPMorgan from an "overweight" rating to an "underweight" rating with a $5.00 price objective on the stock, down from their previous price objective of $9.50.  JP Morgan wrote:

TPG's consent solicitation is underway and likely will have a result within a few weeks (deadline is March 15th). TPG needs a simple majority of the shares outstanding and, because of the concentration of stock ownership, has a real possibility of winning the vote. If TPG wins, the stock probably moves up, in our view. If TPG loses, the stock likely gets hit hard. Regardless of the near-term stock move, ***SD seemingly has to go through extraordinary measures to avoid a financial crunch, and we think too much risk exists relative to the stock upside.*** [emphasis added]

82.     On February 23, 2013, Institutional Shareholder Services urged SandRidge

stockholders to replace a majority of its Board.  A TPG-Axon SEC filing stated:

> . . . ISS recommends SandRidge's bylaws be amended to destagger the Board, that five incumbent directors be removed, and that independent director nominees . . .be elected to the Board. . . .

> \* \* \*

> In its recommendation, ISS noted the following:

> ▪   "The apparent failures of stewardship on this board are legion."

> ▪   "The company's abrupt, piecemeal approach to corporate strategy and concomitant lack of capital discipline have increasingly limited the company's financial flexibility, and engendered a deep distrust in the market."

> ▪   "From a stutter-stepping business strategy and weak capital discipline which reduced financial flexibility so far that the sale of the company's most valuable non-core asset cannot close its anticipated funding gap—to a compensation program which failed to tie pay to performance, making the CEO one of the highest paid in his industry even as shareholder value declined by nearly three-quarters over his tenure—to approving numerous related-party transactions which, under public scrutiny, begin to look more like front-running the company's own lease acquisitions than adding value unavailable through a less conflicted means—there is little reason to believe the outside directors who are specially charged with looking out for the interests of unaffiliated shareholders are best equipped to effect the necessary change at SandRidge ." (emphasis added)

> ▪   "Given the fact pattern underlying the dissidents' extensive case for change, and the evidence of appropriately extensive advance planning to mitigate risks of unintended consequences, shareholder support for a majority change of the SandRidge board is warranted."

▪ "It is true, contrary to the company's assertions, there is compelling senior oil & gas sector management experience among the dissident nominees."

TPG-Axon noted that ISS recommended five out of seven current Directors be replaced immediately but also suggested that the remaining two Directors have short transition periods before being replaced as well.

▪ "Out of prudence, then, and for what we expect – based on the dissidents' frank presentation to shareholders – will be a finite transition period, it may be the lesser of two unpalatable alternatives to leave the CEO on the board for now, and allow the reconstituted board to take further action once it has control of the company".

▪ "For similar reasons, we also believe shareholders may want to retain for a transition period the newest outside director, Brewer."

83.     On March 1, 2013, Stifel Nicolaus analysts downgraded Company shares from Buy to Hold, noting: "following the company's updated EURs and oil cuts for its Miss Lime type curve, which meaningfully lowers the potential upside asset value for the name -- which was the key reason for our Buy rating. *SD was always a name with higher financial risk (meaningful leverage and outspending of CF)*, but the potential upside from its Miss Lime play made the name attractive. ... [T]he extent of the downward revisions to the recoverable oil reserve (152 mbbl/well to 107 mbbl/well) and EURs (433 to 369 mboe), along with updated YE reserves, causes our risked NAV to decrease materially from $18 to $8.86/sh." (emphasis added).

84.     On March 1, 2013, Deutsche Bank analysts lowered their price target on Company shares from $5 to $4, noting:

Another quarter, another downward revision. In the midst of all of the sound and fury of an activist campaign centered

around concerns with management, the biggest problem at SD has been the steady deterioration of the Mississippian. SD revised down its type curve in the play, reducing per well oil reserves by 30% and total reserves by 22% since 3Q. As reserves have eroded, so has the market's bull case on the stock (cheap on NAV), with our NAV suffering a further revision down, and CHK's recent deal in the play adding further headwinds to the ability of SD to accretively sell or JV additional acreage in the future.

85.     On March 4, 2013, Canaccord Genuity maintained its "sell" rating on

SandRidge, halving its price target from $3 to $2, and commented:

> We lowered our target price $1 to $2 per share due to a higher gas composition (production/capital allocation) in the Mississippian play. Specifically, we increased the gas percentage of Miss wells ~5% to ~70%. Assuming a $40K/Boepd production rate multiple for the Gulf of Mexico business (~$1 billion) and ~5K/Mmcfepd production rate multiple for the company's gas assets outside the Mississippian (~$0.65 billion) implies a Mississippian leasehold value of ~$1,500 per acre using year-end '13 enterprise value calculated with a $2 per share equity value.

86.     On March 6, 2013, Goldman Sachs reiterated its Sell rating and $6.00 price

target on SandRidge, noting:

> On February 28 SD reported 4Q12 earnings, reduced its Mississippi Lime type curve by 15% (when including NGLs, oil as percentage of total is 29%) and reduced MS Lime drilling/completion costs. On March 5, SD discussed the MS Lime in more detail at its analyst meeting, highlighting upside from further cost reduction, greater use of artificial lift and multi-zone potential. We update estimates to reflect 4Q results, the sale of Permian Basin assets and new NGLs contract. We update 2013E-15E EPS to -$0.23/-$0.32/-$0.39 from -$0.18/-$0.34/-$0.46 on production/costs /interest expense.

87.     On March 7, 2013, *Wichita Business Journal* reported in an article entitled

"Mississippian still 'an exploration play,' Devon Energy says" that:

> Early drilling results on the Mississippian Lime oil and gas
> play, in northern Oklahoma and southern Kansas, are
> promising, but Devon Energy says the area remains "" and
> not a development play.
>
> Oklahoma City-based Devon holds 600,000 net acres and
> operates 15 rigs in the area, the Tulsa World reports. A Devon
> spokesman says the area holds potential, but that the company
> still has unanswered questions.
>
> Another Oklahoma energy company, SandRidge Energy, is
> making a big bet on the play, however. Earlier this week, the
> Wichita Business Journal outlined SandRidge's plans in
> Kansas for 2013. SandRidge is planning 168 horizontal wells
> in Kansas this year.

88.     Also on March 7, 2013, Canaccord Genuity maintained its "sell" rating on

SandRidge, halving its price target from $2 to $1, and commented:

> We lowered our target price $1 to $1per share due a lesser
> Miss capital yield after recalibrating underlying capital
> productivity post JV carries. Specifically, the company's '13
> capital plan, and associated capital productivity, embeds
> $500-600 million in JV carries versus our prior expectation of
> $300-400 million in JV carries. Accordingly, our underlying
> capital productivity incrementally degrades by ~10%
> assuming a $1.7-1.8 billion capital plan. Notably,
> SandRidge's capital productivity is enhanced by ~30% this
> year as a consequence of JV carries, which are effectively
> exhausted by year end.

89.     On March 10, 2013, *Dow Jones News Service* reported in an article entitled

"Delaware Court Bars SandRidge from Proxy Campaign" that:

> A Delaware Court ordered SandRidge Energy Inc.SD -5.69%
> not to stand in the way of an activist shareholder's attempt to
> shake up its board of directors, tying the company's hands in
> the final week of a contentious proxy campaign.

The ruling, issued Friday by Chancellor Leo Strine Jr. of the Delaware Chancery Court, came one week before the March 15 deadline for shareholders to decide whether to approve a plan put forward by TPG-Axon, a hedge fund that owns 7.3% of the Oklahoma City-based oil and gas producer's shares. The fund is seeking to replace SandRidge's board, including Chief Executive Tom Ward, with its own slate of nominees, and to change the bylaws so the entire board is elected at once.

Unless the company agrees to approve TPG-Axon's slate of nominees, the court barred the company from "impeding TPG's consent solicitation in any way"–SandRidge won't be allowed to ask shareholders who have consented to the fund's proposals to revoke that consent or rely on any revocations it has already received in the upcoming vote.

The company had previously argued that if shareholders elected the TPG-Axon slate without SandRidge's consent it could trigger a call on the company's debt. SandRidge had warned that would be "extreme" and "risky" but then switched its opinion recently, citing market prices that reduced the risk.

Strine questioned in his opinion whether bondholders would consider the board change enough to put the bonds back to SandRidge and noted that bond prices had not changed materially between the company's statements.

"These arguments bring to mind one definition of genius, I suppose," Strine wrote. He included a footnote with that definition from F. Scott Fitzgerald: "The test of a first-rate intelligence is the ability to hold two opposed ideas in mind at the same time and still retain the ability to function."

Strine said the board's actions left him with the impression the board was only attempting to protect its own position instead of acting for shareholders.

"In other words, the incumbent board has simply made the same determination that all incumbents who seek to continue in office make: we are better than the new guys and gals, so keep us in office," Strine wrote.

The board's refusal to approve the nominees implies a belief that SandRidge stockholders "will be too stupid not to be confused," he wrote.

"That self-serving, paternalist explanation cannot justify the doubt that the Proxy Put creates in an electoral contest in which each voting decision may turn out to matter immensely," he wrote.

TPG-Axon said in a statement that the ruling supports its position that SandRidge's board isn't looking out for the company's best interests.

"TPG-Axon believes the ruling further demonstrates why SandRidge directors must be replaced–time and time again, they have shown disregard for stockholder, obsequiousness to CEO Tom Ward, and persistently prioritized their own self-interest," the fund said.

TPG-Axon has said mismanagement has caused the price of SandRidge stock to plummet, even as its top executives remain highly compensated. The fund has also alleged that the board turned a blind eye to land deals between the SandRidge and WCT Resources, which is owned by trusts benefiting Ward's adult children.

SandRidge has argued that TPG-Axon's slate of nominees is unqualified and that the fund has engaged in a "false and misleading" campaign that would derail the company in the long run, and has urged its shareholders not to consent to the fund's proposals.

A spokesman for SandRidge didn't immediately comment.

Mark Lebovitch, a lawyer representing the shareholder who brought the suit, said the ruling could tip the scale at a crucial moment in the proxy campaign.

"To me I don't know what kind of shareholders would vote for the SandRidge board where a judge said they breached their duty of loyalty," he said.

90.     On March 14, 2013, reiterating its prior concerns, JPMorgan, analyst Joseph Allman maintained an Underweight rating on SandRidge, opining that, "On

Wednesday after market close, SD announced a settlement with TPG-Axon. The stock might react positively over the near term due to market optimism about possible changes ahead for the company. We expect that the board and management will be successful in making some changes. ***However, we think SD's high debt level and overhead expenses, even after possible spending and cost reductions, overwhelm the value of the assets.***" (emphasis added).

91.     On April 22, 2013, *SeekingAlpha* reported in an article entitled "Still Too Much Uncertainty At SandRidge" that:

**Outlook**

- ▪ **Mississippian uncertainty:** SandRidge has yet to become cash flow positive in its Mississippi play and its recent divestitures indicate it will become a pure play Mississippian company. This is fine, except this play has yet to prove worthy of supporting major investment and the recent transaction by Chesapeake (NYSE:CHK) in the same play has left the market with a bad taste in their mouth for the Mississippi oil & gas plays. Not to mention, the company also revised the decline curves and estimated ultimate recovery (EUR) downward for its wells in the Mississippian. The company plans to invest more in infrastructure in order to get its lease operating expenses down, but this play has a long way to go before it becomes a good investment. Management is also running its Mississippian economics on $100 oil and $4.25 natural gas, despite NYMEX strip pricing (out 5 years) at around $90 to $95 oil and $3.50 to $4.00 natural gas.

- ▪ **CapEx and liquidity:** After de-levering a little with the recent Permian asset sale, SandRidge has approximately $2 billion to $2.5 billion in liquidity, but projects to spend roughly that same amount in the Mississippian over the next couple of years in order to derisk its more than 800,000 net acres in

Kansas/Oklahoma. Until the Mississippian play turns the corner and starts to produce cash flow, it will either have to spend outside of the company's operating cash flow beyond the next two years or halt all CapEx and production growth.

- **What are the company's options?** SandRidge's managers don't have many options in which direction they can take this company and with TPG joining the mix, things are definitely going to get interesting. The cost cutting, reducing debt, increasing liquidity, focusing on a core asset, and figuring out who the new CEO will be are all things that need to be done over the next twelve months. You could argue that it does not have a core asset worth investing in, but SandRidge definitely believes in the Mississippian play and the direction that can take the company. There is plenty to be said about what will happen there and TPG will definitely have a say in what happens.

Bottom line

There are two ways to look at this, which way you go depends on your appetite for risk: **Value trap with poor assets and management** OR **light at the end of the tunnel with TPG leading the way to shareholder value creation**.

We are leaning towards a value trap. There is market skepticism about the Mississippian due to their poorer than expected results (and changing EUR's), and the lackluster deal/JV recently struck by Chesapeake that puts pressure on the area.

That isn't to say that SandRidge can't turn the corner with its assets in the next year or two, lower its overhead costs and gain some liquidity through divesting non-core assets. The next two or three months will have a lot to say about what is next for SandRidge. I would accumulate a small position, and possibly consider some downside protection with covered calls (which is an income oriented strategy) and wait for good news or signs of change before growing the position further.

92.     On May 3, 2013, *Wichita Business Journal* reported in an article entitled

"Report: SandRidge board appears to struggle with direction for company" that:

> Affiliates of hedge fund TPG-Axon Capital now occupy four
> of the 10 seats on SandRidge Energy Corp.'s board of
> directors, but they aren't finding it ease to reverse the oil and
> gas company's declining stock price.
>
> A Reuters report says SandRidge's reconfigured board faces
> increased pressure to reverse course and increase the
> company's stock, which has hovered around $5 a share in
> recent weeks.
>
> SandRidge (NYSE: SD) has been hit hard by 10-year lows in
> natural gas prices and has had disappointing forecasts for its
> wells on the Mississippian Lime play in Kansas and
> Oklahoma, which now constitute the bulk of its holdings,
> according to the Reuters report.
>
> As a result, the board has been looking for cost-cutting
> changes, including reviewing how executives are
> compensated, selling its planes, and cutting advertising and
> sponsorship spending. Reducing the number of drilling rigs
> also has been discussed.
>
> Compounding the company's troubles is uncertainty about the
> future of its founder and CEO, Tom Ward. While Ward still
> has a job for now, analysts contend his days are numbered.

93.     On May 7, 2013, *Dow Jones News Service* reported in an article entitled

"SandRidge Energy to Slash Capital Spending After Reporting Wider Loss" that:

> SandRidge Energy Inc.'s (SD) newly expanded board said
> Tuesday it has moved to slash the company's spending and
> refocus production for the rest of the year.
>
> The company said in a press release the board and
> management have reviewed the company's strategy, spending
> and assets, and decided to make some changes, including
> cutting overhead costs and concentrating on developing the
> most productive areas in the Mississippian formation.

SandRidge's capital budget for the year has been cut to $1.45 billion, $700 million less than the company spent last year and less than the $1.75 billion it had previously said it planned to spend.

The move underscores the change of direction prompted by shareholders angry at the company's debt-fueled spending. After months of conflict with TPG-Axon Management, a rebellious New York hedge fund, the company agreed to bring in four new board members that had been nominated by the dissident investor and to review its strategy.

On Tuesday, SandRidge reported a net loss of $493 million, or $1.03 per share, for the first quarter, sharply widening from a year-earlier loss of $232 million or 58 cents per share. Adjusted earnings for the quarter were $2 million, or break even. SandRidge reported revenue of $511.7 million during the quarter, up from $381.6 million, on higher oil and gas production. Analysts had expected SandRidge to report a loss of 6 cents per share on revenue of $479 million.

94.     On June 20, 2013, *The Wall Street Journal* reported in an article entitled

"New SandRidge CEO Expects Fiscal Discipline" that:

SandRidge Energy Inc. will focus on drilling its most promising oil and gas properties while running a tight fiscal ship, new Chief Executive James Bennett said Thursday.

The company will be following a strategy put in place by a recently revamped board. Mr. Bennett, who had served as SandRidge's chief financial officer since 2011, on Wednesday replaced embattled founder Tom Ward, who is getting a severance package valued at about $90 million. Mr. Ward's compensation and allegations of self-dealing were at the center of a months-long proxy battle between the company and New York hedge fund TPG-Axon Capital LP.

Now Mr. Bennett faces the task of bringing SandRidge's spending in line while producing long-awaited results for shareholders. His pre-SandRidge background—a career in private equity, including a three-year stint with credit investors GSO Capital Partners, now a unit of Blackstone Group LP—has led some analysts to ponder whether his

appointment would lead to more deal-making or the sale of the company.

But Mr. Bennett said in an interview that his ascension doesn't mean the company is up for sale, or that shareholders should expect to see major parts of the portfolio sold. "We're committed to optimizing the assets, growing assets, deploying capital—not selling the company," Mr. Bennett said. "We think with the balance sheet and liquidity we have right now...it's best for shareholders to grow the business and execute on those assets."

95.    On August 16, 2013, *Wichita Business Journal* reported in an article entitled "The Maddening Mississippian: A fickle oilfield with dogged drillers; the irregular geology of Kansas' Mississippian Lime petroleum play has caused some drillers to give up. But a few with experience and scale are making a go of it" that:

Perhaps we should call it the Hit-or-Mississippian.

Two years ago, the Mississippian Lime - the vast limestone formation that underlies much of Oklahoma and Kansas - was often likened to the Bakken Shale, the oil-bearing geological formation that has made North Dakota the Saudi Arabia of North America.

Land in south-central Kansas that once leased for $30 or $50 an acre was going for $500, and it was going fast.

But the Mississippian, it turns out, is no Bakken.

Wildly inconsistent results have made horizontal drilling on the play a risky bet for all but the largest and most experienced operators.

That the promise had faded became clearer when Chesapeake Energy Co., one of the largest leaseholders on the play, sold a joint-venture interest in its Mississippian assets in Oklahoma early this year for cents on the dollar. Meanwhile, Chesapeake is basically sitting idle on its substantial Kansas acreage.

43

Even petroleum behemoth Shell Oil Co., which has hundreds of thousands of acres on the play, is scaling back, apparently deciding it can better invest its resources elsewhere.

Geological gambling

The problem with the Mississippian, Forrest Gump might say, is that you never know what you're gonna get.

There's no doubt that a vast amount of oil is trapped in the limestone beneath Kansas. Like the oil in the Bakken Shale, the Mississippian's riches can be reached when drillers spend millions on specialized wells that reach the oil from a horizontal angle then use high-pressure fluids to fracture the rock that traps it.

The Bakken, though, is flat and relatively uniform. Drill a hole, break the rock, and oil is almost certain to flow. That's not the case with the Mississippian.

Dick Schremmer, president of Bear Petroleum in Haysville, says the biggest complaint against the Mississippian is that the oil comes and goes.

"It's just not one big flat zone," he says.

Elevation changes within the formation make it hard to know how deep to drill wells. And the oil isn't pooled uniformly. Some wells will be gushers. Some will be duds. Many start as gushers and quickly become duds. In any case, the driller has invested $3 million or more in the well.

"Production is not uniform across the whole region," says Jon Callen, president of Edmiston Oil in Wichita. "I just don't think they are finding the success for what it takes to drill and complete a well."

David Newell, an assistant scientist with the Kansas Geological Survey, says the Mississippian's inconsistency makes it hard to know if a driller will make back his investment. Not every well drilled will be production-rich or pay out quickly. An average well, Newell says, could take three or four months after it is drilled to reach peak production.

Plus, the Mississippian is a tight reservoir that's being drained, he says. That means production from Mississippian wells tends to fall off dramatically after that initial peak, further increasing the time it takes for them to be profitable.

Oil and gas producers typically allow two years for a well to turn a profit.

To break even on a $3 million well in that time, a producer would need income of $4,110 a day. At $100 for a barrel of oil, that means at least 40 barrels of oil per day.

However, Newell says, many Mississippian wells don't meet that standard. "The majority of them are not making that criteria, and some never will," Newell says.

The hardy persist

But don't count the Mississippian out just yet.

Wichita producer Wayne Woolsey, for one, remains committed to it.

\* \* \*

Another company making a go of it: SandRidge Energy Inc.

No one has more riding on the Mississippian than Sand-Ridge. The Oklahoma City-based company has even shed its assets in other plays to concentrate on its roughly 1 million Mississippian acres.

During a conference call with investment analysts last week, CEO James Bennett said the company's seeing its performance on the Mississippian improve. SandRidge, he said, drilled 111 wells on the play in the second quarter, with an average initial production of 377 barrels of oil equivalent per day.

SandRidge's success lies partly in its heft. The company can afford to drill a lot of wells. It has roughly 3,000 of them on the Mississippian. Wells that don't work out are easily offset by those that do.

> Bennett said SandRidge averaged 47,300 barrels of oil equivalent per day during the second quarter, a 20 percent increase from the first quarter.
>
> And SandRidge is figuring out how to drill wells more cheaply, deploying its drilling rigs efficiently across its footprint and coming up with some innovations in the expensive disposal of drilling fluids. Economies of scale and experience also matter.
>
> During the second quarter, SandRidge reduced its drilling costs to $2.95 million per well, from $3.1 million earlier this year. That means more wells will turn a profit.

96.     On September 11, 2013, *Wichita Business Journal* reported in an article entitled "SandRidge Energy sells $30M in trust shares to help capitalize Mississippian drilling" that:

> SandRidge Energy Inc. is selling its shares in two of its trusts and using the money to further capitalize its expansive operations on the Mississippian Lime play.
>
> The Oklahoma City oil and gas company sold 1 million shares each in its SandRidge Permian Trust (NYSE:PER) and SandRidge Mississippian Trust II (NYSE:SDR), a sale valued at nearly $30 million, according to a report in *The Oklahoman*.
>
> It was the fourth time SandRidge (NYSE: SD) has sold shares of those trusts since their initial public offering. SandRidge CEO James Bennett told The Oklahoman that the sale is routine and in line with the company's plans for the trusts.
>
> He said SandRidge is using the proceeds both to fund general operations as to continue development of the company's Mississippian assets.

97.     On November 6, 2013, *24/7 Wall St.* reported in an article entitled "SandRidge, Chesapeake Hit Oil Slicks" that:

Two major energy producers ran into some problems with investors on Wednesday after reporting third quarter earnings. SandRidge Energy Inc. (NYSE:SD) and Chesapeake Energy Corp. (NYSE:CHK) both posted results that were better than analysts' consensus estimates, but the outlook for both companies weighed on their stock prices today.

SandRidge produced nearly 4 million barrels of oil during the third quarter and about 25.8 billion cubic feet of natural gas, for total barrel of oil equivalent production of 8.25 million barrels or 89,600 barrels of oil equivalent per day. Not including the impact of derivatives, the company's average realized price per barrel came to $95.71 and the realized price per thousand cubic feet of natural gas was $3.15. SandRidge raised full-year production guidance from 33.3 million barrels of oil equivalent to 33.6 million barrels.

* * *

At the end of the second quarter SandRidge estimated its full-year average oil differential at $9.50 a barrel, reflecting higher volume of natural gas liquids and a decrease in premiums for its Louisiana Light Sweet crude oil. The company now estimates the differential at $0.50 a barrel for 2013. That implies significantly lower prices in the fourth quarter.

Shares of Chesapeake are down more than 7% at $26.15 in a 52-week range of $16.23 to $29.06.

SandRidge shares are down more than 8% at $5.97 in a 52-week range of $4.52 to $7.47.

98.    On January 10, 2014, S&P affirmed its 'B' corporate credit rating on SandRidge and its 'B-' issue rating on the company's $3.2 billion of senior unsecured notes.   A B rating is two notches into speculative.   An obligor rated 'B' is more vulnerable than the obligors rated 'BB', but the obligor currently has the capacity to meet its financial commitments. Adverse business, financial, or economic conditions will likely impair the obligor's capacity or willingness to meet its financial commitments.

99.    On May 7, 2014, *The Daily Oklahoman* reported in an article entitled

"SandRidge boosts production while earnings drop" that:

> SandRidge Energy Inc. is warming up with the weather, but
> that did not prevent the Oklahoma City-based company from
> posting a net loss of $128 million, or 29 cents a share, for the
> first quarter. The company lost $531 million, or $1.03 a share,
> in the same period of last year. SandRidge managed to beat
> analysts' estimates for the first quarter with its adjusted net
> income of $37.9 million, or 7 cents a share. SandRidge's total
> production dipped to 7.1 million barrels of equivalent, as
> winter weather hampered its efforts in northern Oklahoma
> and southern Kansas, but CEO James Bennett remains
> optimistic about the company's growth potential. "We are
> well on our way to deliver the early part of our three-year
> growth plan introduced at our March analyst day," Bennett
> said.
>
> "Resumed normal weather conditions have us back on track,
> with recent activity offsetting the temporary extreme weather
> challenges in our first quarter Mid-Continent operations." He
> said SandRidge produced an average of 55,000 barrels of oil
> equivalent a day in April, while bringing 45 new wells online.
> The company completed 71 wells in the first quarter, when
> production averaged 51,000 barrels a day. "We continue to
> advance our value initiatives such as the multi-lateral well
> programs, producing from multiple zones, and expanding our
> asset base as with the addition of Oklahoma's northern
> Garfield County into our focus area," Bennett said. "These
> efforts continue to position SandRidge as the premier
> operator in the Mid-Continent region."

100.    On May 23, 2014, *The Daily Oklahoman* reported in an article entitled

"SandRidge trying new drilling techniques to boost production" that:

> SandRidge Energy Inc. is changing the way it talks about its
> asset base.
>
> The company staked its future on its position in the
> Mississippian formation that spans northern Oklahoma and

southern Kansas when it sold assets in the Gulf of Mexico and the Permian Basin in west Texas.

SandRidge officials now refer to the company's operations in the Mid-Continent, stressing efforts to drill into other oil- and natural gas-producing zones.

"We say we want to be the premier, high-return, growth-oriented, resource conversion company focused in the Mid-Continent," CEO James Bennett said March 4.

David Lawler, the company's executive vice president and chief operating officer, said there are four to six producing zones in the Anadarko Shelf, including the Mississippian, Chester, Marmaton and Woodford.

"We're starting to test all of those formations," Lawler said. "There's a significant amount of oil in place that we have yet to recover."

He said SandRidge has had a fair amount of success in those other zones so far, particularly in the Chester. It was the first company to drill a horizontal oil well into the sandstone formation.

Lawler said SandRidge has come up with some new well designs to develop those zones, drilling multiple laterals from the same well. That allows the company to take advantage of its existing infrastructure, while minimizing surface disruption. It can also help SandRidge produce oil and gas from sections that may not have been economical otherwise.

"This is novel well technology," he said. "It's cutting edge."

SandRidge is testing three prototype multilateral well designs to find "more oil for less money," he said.  The first was drilled in September in Harper County, Kansas.

"This is the first time this technique has ever been used in this part of the country," he said.

Lawler said the multilateral wells are meant to give the company access to more reserves from a single "take point," while also reducing costs.

The company is trying wells with two or three laterals, which can be stacked. The most recent well, which has stacked laterals into two different zones, produced more than 700 barrels of oil equivalent in its first month, while saving SandRidge about $400,000, he said.

SandRidge also is testing a trilateral well, drilling three separate horizontal wells from the same vertical.

"In this case, we're effectively draining one entire section from a single well bore," Lawler said.

SandRidge intends to drill 20 multilateral wells this year. Lawler said future tests could involve as many as five laterals from a single well bore. He said the technique could help SandRidge cut as much as 26 percent from its drilling costs. SandRidge already has pared its average well costs from $3.9 million to $2.9 million over the past two years.

Lawler said the designs resulted from a 2012 gathering of about 65 of SandRidge's best field workers to "drill the well on paper." He praised the company's workers and their innovation.

"I think we have the most talent per barrel of any company in the industry," Lawler said.

101. On August 6, 2014, *The Daily Oklahoman* reported in an article entitled

"SandRidge Energy beats expectations in first quarter" that:

Despite power and weather disruptions in Texas, SandRidge Energy Inc. increased its second-quarter production to nearly 70 million barrels of oil equivalent a day. That is up 19 percent over last year, SandRidge said Wednesday as it reported net earnings of $34.2 million, or 6 cents a share. SandRidge earned $44.6 million, or 8 cents a share, in the second quarter of last year, but still beat analysts' estimates despite that dip. CEO James Bennett said SandRidge's decision to focus on the Mid-Continent region is paying dividends with improving drilling results and lower costs. He said the company's initial production rates in the Mississippian formation are higher than they've been in two

years, while its results from the Chester formation are exceeding expectations.

102.   Also on August 6, 2014, *Midnight Trader Live Briefs* reported in an article entitled "SandRidge Energy Drops 5%, Q2 Revenue Shy of Street View":

> Oil and gas producer SandRidge Energy (SD) slips late Wednesday after beating with Q2 profit but missing with revenue. It also cuts production guidance.
>
> The company reported adjusted Q2 net income of $34.2 million, or $0.06 per share, compared to adjusted net income of $44.6 million, or $0.08 per share, in Q2 2013. The analyst consensus in the Capital IQ survey was for $0.04 per share.
>
> Revenue was $374.7 million compared to $512.9 million in the same period a year earlier. The Cap IQ figure was for $388 million. The company also said Permian Trust well performance and Mid-Continent power disruptions revise production growth guidance to a 19% - 23% range.
>
> A portion of final area available for development in the Permian trust encountered high water saturations which is estimated to result in a total shortfall of 350 MBoe (95% liquids) for 2014. Mid-Continent well performance continues to be strong, but power and weather disruptions late in Q2 resulted in 250 MBoe of production deferment. As a result, the company is introducing a 28.0 - 29.0 MMBoe guidance range which equates to a 19% - 23% pro forma growth range, it said in its release.

103.   On October 16, 2014, *American Banking and Market News* reported that "as of September 15th, there was short interest totaling 66,303,709 shares, an increase of 11.5% from the August 29th total of 59,475,995 shares, Analyst Ratings Network reports. Currently, 15.8% of the shares of the stock are sold short."

104.   On October 22, 2014, *Benzinga* reported in an article entitled "SandRidge

Energy, Inc. Announces Increase In Borrowing Base And Extension Of Credit Facility"

that:

> SandRidge Energy, Inc. (NYSE: SD[1]) today announced that
> it has increased the borrowing base and extended the maturity
> of its senior credit facility. The new, five-year agreement with
> 27 lending institutions has a maximum facility size of $2
> billion and an initial borrowing base of $1.2 billion. Due to its
> current liquidity position and hedging program, the company
> elected to initially set a facility limit of $900 million, which
> can be expanded up to the $1.2 billion borrowing base upon
> written request.
>
> These terms represent a $425 million increase in borrowing
> base capacity, a $125 million increase in currently available
> liquidity, and a 25 basis point reduction in drawn borrowing
> costs. The facility matures on October 22, 2019. Bank of
> America N.A. acts as the Administrative Agent and is joined
> by six other lead banks: Barclays Bank PLC, Capital One,
> Royal Bank of Canada, Sun Trust Bank, Union Bank N.A.,
> and Wells Fargo Bank N.A.
>
> "The continued success in our Midcontinent drilling program
> comfortably supports an increase in our revolver borrowing
> limit from $775 million to $900 million, which is currently
> completely undrawn," noted SandRidge CEO and President
> James Bennett.
>
> "We want to assure our shareholders SandRidge is uniquely
> protected against risks associated with declining crude oil
> prices plaguing the market today. The combination of our
> attractive hedge position of over 90% of remaining projected
> 2014 liquids volumes and the majority of planned liquids
> production in 2015 hedged at prices over $90 per barrel, as
> well as our focus on further reducing drilling costs per
> horizontal lateral well, provides protection to our cash flows
> and liquidity."

105.   On October 23, 2014, *Plus Media Solutions* in an article entitled "Shale

Boom's Allure to Wall Street Tested by Drop in Oil Prices" that:

Global Association of Risk Professionals has issued the following news release:

Falling oil prices are testing investors' commitment to the Wall Street-funded shale boom.

Energy stocks led the plunge earlier this month in U.S. equities and the cost of borrowing rose. The Energy Select Sector Index is down 14 percent since the end of August, compared with 3.8 percent for the Standard & Poor's 500 Index. The yield for 190 bonds issued by U.S. shale companies increased by an average of 1.16 percentage points.

Investors' sentiment toward the oil and gas industry has "certainly changed in the last 30 days," said Ron Ormand, managing director of investment banking for New York-based MLV & Co. with more than 30 years of experience in energy. "I don't think the boom is over but I do think we're in a period now where people are going to start evaluating their budgets."

\* \* \*

Yields on SandRidge Energy Inc.'s $450 million bond due in 2020 climbed to a record 10.253 percent on Oct. 16, Trace data show. The Oklahoma City-based company's capital expenditures were $3.6 billion in the past year, almost five times more than its cash from operations of $714.7 million, company data compiled by Bloomberg show.

SandRidge has an unused $775 million credit line and no bonds due until 2020, said Jeff Wilson, a company spokesman. It also hedged 90 percent of liquids production in 2014 and a majority in 2015, he said.

106.    On October 24, 2014, SandRidge filed a $100 million registration statement Friday detailing plans to shift the bulk of its saltwater disposal assets into a master limited partnership called MidCon Midstream LP, described as a "growth-oriented, fee-based master limited partnership."

107.    On November 4, 2014, SandRidge disclosed that the SEC had asked it to review how it accounts for penalties paid pursuant to a 30-year agreement with Occidental Petroleum Corp. ("Occidental"), under which SandRidge must pay a penalty fee when it misses minimum required carbon-delivery volume targets.  SandRidge had accounted for the penalty annually, and the SEC asked it to look into whether liability should be accrued quarterly.  SandRidge disclosed that the review could result in a restatement of almost two years of quarterly results (from the period ended December 2012 through the three months ended June 30, 2014), and delayed its third quarter financial report until a resolution was reached.  In response, SandRidge shares were off 6.43% to $3.57 after hitting an all-time low of $3.50, a level also touched in October.

108.    On November 19, 2014, SandRidge disclosed that, on November 14, 2014, it had entered into an agreement with Bank of America, N.A., as Administrative Agent, Swing Line Lender and L/C Issuer, and the other Lenders party to the Third Amended and Restated Credit Agreement, dated as of October 22, 2014 (the "Credit Agreement"), to amend the Credit Agreement and waive any Default that may have arisen under certain provisions of the Credit Agreement, based upon certain conditions.

109.    On November 29, 2014, *The Daily Oklahoman* reported in an article entitled "Oil slide hammers Oklahoma energy stocks" that:

> An oil sell-off hammered Oklahoma energy stocks Friday, a day after the Organization of Petroleum Exporting Countries decided to leave production steady.  The price of a barrel of light, sweet West Texas Intermediate crude settled at $66.15 Friday, down 10 percent. Brent crude, the international benchmark, fell $2 to $70.45. Shares of Oklahoma City's Continental Resources Inc. fell 20 percent.

Devon Energy Corp. dropped 8 percent. Chesapeake Energy Corp. slid 12 percent, while SandRidge Energy Inc. fell 26 percent.

110.    On December 6, 2014, *The Economist* published an article entitled "Shale oil: In a bind; Will falling oil prices curb America's shale boom?" with reported that:

THIS year's Christmas parade in Lindsay, in the heart of Oklahoma's oil country, featured the Stars and Stripes every ten yards, 11 horses with riders in Santa hats and a rifle salute by veterans. But the highlight was a thundering, bright red oil tanker covered in fairy lights and owned by Hamm & Phillips, an oil-services firm with local roots that has ridden the shale boom in the state and across America.

That energy revolution is the envy of the business world. Abundant oil and gas have been extracted from underground rocks by blasting them with a mixture of water, chemicals and sand—"fracking", in the jargon. As well as festive spirit, the firms responsible embody an all-American formula of maverick engineers, bold entrepreneurs and risk-hungry capital markets that no country can match.

Yet now that oil prices have fallen by almost 40% in six months, these firms' mettle is being tested. Across America shale-shocked executives will spend Christmas overhauling their strategies to cope with life at $70 per barrel, even as investors dump their firms' shares and bonds. Executives at Lukoil, a big Russian firm, now sniff that shale is like the dotcom bubble—a mania that is being cruelly exposed.

Oil-price slumps usually lead to cuts in energy firms' investments. Production eventually falls, helping prices to stabilise. In 1999, after the Asian crisis, global investment in oil and gas production dropped by 20%. A decade later, after the financial crisis, investment fell by 10%, then recovered.



**Hail, shale**
Oil supply
Barrels per day, m

Brent crude oil price
$ per barrel

OPEC

Non-OPEC

US

2004 05  06  07  08  09  10  11  12  13  14

Sources: IEA; Bloomberg

*Includes natural gas liquids and non-conventional oils

This time some of the pain will be taken by the big integrated energy firms, such as Exxon Mobil and Shell. After a decade of throwing shareholders' cash at prospects in the Arctic and deep tropical waters to little effect, they began cutting budgets in 2013. Long-term projects equivalent to about 3% of global output have been deferred or cancelled, says Oswald Clint of Sanford C. Bernstein, a research firm. Most "majors" assume an oil price of $80 when making plans, so deeper cuts are likely.

But much of the burden of adjustment will fall on America's shale industry. It has been a big swing factor in supply, with output rising from 0.5% of the global total in 2008 to 3.7% today. That has required hefty spending: shale accounted for at least 20% of global investment in oil production last year. Saudi Arabia, the leading member of OPEC, has made clear it will tolerate lower prices in order to do to shale firms' finances what fracking does to rocks.

Even the gods of shale disagree about the industry's resilience. The boss of Continental Resources, Harold Hamm (whose fortune has dropped by $11 billion since July), has said he can cope as long as the oil price is above $50. Stephen Chazen, who runs Occidental Petroleum, has said the industry is "not healthy" below $70. The uncertainty reflects the diversity of activity. Wells produce different mixes of oil and gas (which sells for less). Transport costs vary: it is cheap to pipe oil from the Eagle Ford play, in Texas, but expensive to shift it by train out of the Bakken formation, in North Dakota. Firms use different engineering techniques to pare costs.

Two generalisations can still be made. First, in the very near term, the industry's economics are good at almost any price. Wells that are producing oil or gas are extraordinarily profitable, because most of the costs are sunk. Taking a sample of eight big independent firms, average operating costs in 2013 were $10-20 per barrel of oil (or equivalent unit of gas) produced—so no shale firm will curtail current production. But the output of shale wells declines rapidly, by 60-70% in their first year, so within a couple of years this oil will stop flowing.

Second, it is far less clear if, at $70 a barrel, the industry can profitably invest in new wells to maintain or boost production. Wood Mackenzie, a research consultancy, estimates that the "break-even price" of American projects is clustered around $65-70, suggesting many are vulnerable (these calculations exclude some sunk costs, such as building roads). If the oil price stays at $70, it estimates investment will be cut by 20% and production growth for America could slow to 10% a year. At $60, investment could drop by as much as half and production growth grind to a halt.



**A fractured balance-sheet**
Leverage of US independent energy companies
Debt, $bn          Debt to gross cashflow
Sources: Bloomberg; *The Economist*

The industry's weak balance sheet is also a vulnerability, says Michael Cohen of Barclays, a bank. Most firms invest more cash than they earn, making up the difference by issuing bonds. Total debt for listed American exploration and production firms has almost doubled since 2009 to $260 billion (see chart), according to Bloomberg; it now makes up 17% of all America's high-yield (junk) bonds. If debt markets dry up and profits fall owing to cheaper oil, the funding gap

could be up to $70 billion a year. Were firms to plug this by cutting their investment budgets, investment would drop by 50%. In 2013 more than a quarter of all shale investment was done by firms with dodgy balance sheets (defined as debt of more than three times gross operating profits). Quite a few may go bust. Bonds in some smaller firms trade at less than 70 cents on the dollar.

All this suggests looming investment cuts that within a year will slow growth in American shale production to a crawl and perhaps even lead to slight declines. A few firms have trimmed their budgets already. More are expected to announce cuts in January. "Frontier" projects—on the fringes of existing basins or in places where little commercial production has taken place—are vulnerable, including Oklahoma. Most firms will hunker down in the Bakken, the Eagle Ford and the Permian Basin, where they have scale and infrastructure. Even in the Bakken, applications for drilling permits fell by almost 40% in November.

OPEC's wishes may seem to be coming true over the next year. But adversity will eventually make shale stronger. It will prompt a new round of innovation, from cutting drilling costs through standardisation to new fracking techniques that increase output. Dan Eberhart, the boss of Canary, a Denver-based oil-services firm, says the industry has already "pressed fast forward" on saving costs.

And if and when prices recover, new wells can be brought on stream in weeks, not years. America's capital markets will roar back into life, forgiving all previous sins. "There is always a new set of investors," says the boss of a one of the world's biggest natural-resources firms. He predicts a shale crash—and a rapid rebound.

111.    On December 8, 2014, *SNL Daily Gas Report* reported in an article entitled

"Chesapeake, SandRidge chart divergent paths out of old leaders' shadows" that:

Spring 2013 was not the best of times for Chesapeake Energy Corp. and SandRidge Energy Inc. Led by a pair of powerful CEOs - Aubrey McClendon and Tom Ward, respectively, who had collaborated to create Chesapeake in 1989 - the two Oklahoma City-based independent oil and gas producers were

struggling with debt and shareholder discontent with their direction.

Once able to dominate the course of their respective companies, McClendon and Ward had been weakened by changes to their boards of directors forced by major shareholders and allegations of personal misconduct.

Chesapeake, which had become one of the nation's largest independents, had seen its share price plummet from a high of $69.40 in July 2008 to less than $17 by the start of 2013. Its founder and CEO, the scandal-plagued Aubrey McClendon, was on his way to a forced retirement. The company, which had been considered as an example of how independents should operate just a couple of years earlier, was looking for ways to get out of billions of dollars in debt.

The situation was not much better for SandRidge, led by Chesapeake co-founder Tom Ward. Its share price, which had reached a high of $68.54 in June 2008, had cratered to less than one-tenth of that amount by 2013. Ward, like McClendon, found himself embroiled in personal controversy and would be forced to leave the company by summer.

In the months that followed, the companies have taken different approaches to try to extricate themselves from the difficulties they had shared. In the case of Chesapeake, the changes have been successful. For SandRidge, the situation remains tenuous.

* * *

While Chesapeake has been able to continue to move forward, SandRidge finds itself mired in a situation it has been unable to get out of since before Ward's departure in June 2013.

* * *

While Ward left with a golden parachute, he left SandRidge with a debt situation not unlike Chesapeake's. But unlike the situation at Chesapeake, Ward and SandRidge had trouble finding a place to focus, which would prove costly. The company sold assets in the Piceance Basin in 2009 to

emphasize activities in the Permian Basin, but then it agreed to sell the majority of its Permian assets in December 2012 for $2.6 billion. The company purchased offshore assets in the Gulf of Mexico for $1.2 billion in 2012 but sold them for a loss in January. The company's nearly sole focus has become the Midcontinent, especially the Mississippian Lime play, which Ward called "highly scalable [and] high return" when SandRidge sold the bulk of its Permian holdings.

Wangler said the situation Ward left for his replacement, James Bennett, was not optimal.

"It was [a] rather tough one, and that situation really hasn't changed much, outside of the smart offshore sale that did buy them some more time with a cash influx," he said.

* * *

Putting most of the company's eggs in one basket, unlike Chesapeake's strategy, appears to have backfired.

"They've made a concentrated bet," Hanson said. "To date, [Ward's gambles] have not paid off, and the shareholders have paid a big price for that. The share price is ugly right now."

On Dec. 4, SandRidge shares closed at $2.35 on the New York Stock Exchange.

Wangler gave Bennett credit for stabilizing the situation at SandRidge but said it would take a lot more than luck to improve the company's prospects.

"They have done some smart things to help, but the hole dug by previous management was and remains rather deep, so, if anything, it's still a work in progress with a lot of uphill left," he said.

* * *

When asked what he saw in the near future for the two companies, Hanson gave a stark comparison.

"Chesapeake, they can make money [in a depressed-oil-price environment]. They've got Marcellus gas, Haynesville gas

still works pretty nicely, and they've got Eagle Ford oil," he
said.

And for SandRidge ?

"I don't see how they could pivot [from the Mississippian
Lime]. They don't have the money," he replied. "Right now,
they don't have a leg to stand on."

112.　On December 17, 2014, *American Banking and Market News* reported in an

article entitled "Recent Research Analysts' Ratings Updates for SandRidge Energy (SD)"

that:

> SandRidge Energy (NYSE: SD) received a number of price
> target changes and ratings updates during the last week:
> SandRidge Energy was downgraded by analysts at TheStreet
> from a "hold" rating to a "sell" rating.  SandRidge Energy
> was downgraded by analysts at SunTrust from a "buy" rating
> to a "neutral" rating. SandRidge Energy had its price target
> lowered by analysts at Barclays from $5.00 to $1.50. They
> now have an "equal weight" rating on the stock. SandRidge
> Energy was downgraded by analysts at Wunderlich from a
> "hold" rating to a "sell" rating. They now have a $1.00 price
> target on the stock, down previously from $5.00.SandRidge
> Energy is now covered by analysts at JMP Securities. They
> set an "outperform" rating on the stock. SandRidge Energy
> Inc.  (NYSE:SD[1])  opened  at  1.71  on  Wednesday.
> SandRidge Energy Inc. has a 1-year low of $1.50 and a 1-year
> high of $7.43. The stock's 50-day moving average is $3.21
> and its 200-day moving average is $4.99. The company's
> market cap is $829.9 million.

113.　On December 22, 2014, SandRidge announced that it was invoking a

mandatory conversation of its 6.0% Convertible Perpetual Preferred Stock (Cusip

80007P885) (the "Convertible Preferred Stock"), that each share of Convertible Preferred

Stock automatically converted into 9.211496 shares of Common Stock of the Company,

and that dividends on the Convertible Preferred Stock had ceased accruing as of the prior day.

### By 2015 It is Clear that SandRidge Is Highly Speculative and Highly Likely to Go Bankrupt

114.    A January 7, 2015, article on *TheStreet.com* entitled "Bottom Fishing in Oil Stocks? Here's Where to Set the Hook" reported in part that "There are two ways to try and play even a technical rally in oil. Certainly the stocks that will react the quickest to even the most modest rise in crude prices are the ones that have been the hardest hit -- *those that have real bankruptcy risk in their share prices, names such as Halcon, SandRidge Energy* and Goodrich Petroleum." (emphasis added).

115.    On January 9, 2015, SandRidge released its Third-quarter 2014 earnings after several months of discussions with the SEC.  As *The Daily Oklahoman* reported in a January 9, 2015 article entitled "Oklahoma City-based SandRidge Energy reports third-quarter profit"

> … The Oklahoma City-based oil and natural gas producer posted net income of $157.3 million, or 30 cents a share, for the quarter that ended Sept. 30. That is up from a loss of $81.4 million, or 20 cents a share, for the same period of 2013.SandRidge also filed restated quarterly results for the past two years after the SEC questioned its accounting practices related to how the company recorded potential liabilities for failing to deliver the promised amount of carbon dioxide to Occidental Petroleum Corp. SandRidge had been reporting accrued liabilities from the Occidental contract annually, while the SEC preferred quarterly reporting. Chief Financial Officer Eddie Leblanc said the change did not affect SandRidge's annual results or cash flows. . . .  For the third quarter, SandRidge's adjusted earnings beat analysts' estimates by 3 cents a share.CEO James Bennett said SandRidge is expanding its low-cost multilateral drilling

program as it extends its Mid-Continent operations into new formations. He said falling oil prices have left the company in a defensive position for 2015. "We have an enviable hedge position on the vast majority of our liquids production, have no bond maturities until 2020 and at quarter end $1.4 billion of liquidity.

Importantly, our Mid-Continent drilling program continues to generate commercial returns, even at current commodity prices," Bennett said." Given the market backdrop, we are high grading our development plans and are already reducing our rig count and capex (capital expenditure) levels." He said SandRidge expects to announce its 2015 spending plans next month." Meanwhile, our teams are focused on continued well cost reductions, now further supported by likely lower service costs ahead," Bennett said.

116.   On January 10, 2015, Wunderlich set a $1.00 target price on shares of SandRidge in a research note, with a "sell" rating.

117.   On January 14, 2015, SandRidge was downgraded by Barclays from an "equal weight" rating to an "underweight" rating with a $0.50 price objective on the stock, down from their previous price objective of $1.50.

118.   On January 15, 2015, *TheStreet.com* reported that SandRidge shares fell to a 52-week low of $1.17, recovering slightly to $1.21, with West Texas Intermediate oil falling. *TheStreet.com* further reported:

"We rate SANDRIDGE ENERGY INC (SD) a SELL. This is driven by multiple weaknesses, which we believe should have a greater impact than any strengths, and could make it more difficult for investors to achieve positive results compared to most of the stocks we cover. The company's weaknesses can be seen in multiple areas, such as its unimpressive growth in net income, weak operating cash flow, generally high debt management risk, generally disappointing historical performance in the stock itself and feeble growth in its earnings per share."

* * *

    * Currently the debt-to-equity ratio of 1.93 is quite high overall and when compared to the industry average, suggesting that the current management of debt levels should be re-evaluated. Regardless of the company's weak debt-to-equity ratio, SD has managed to keep a strong quick ratio of 1.77, which demonstrates the ability to cover short-term cash needs.

    * Looking at the price performance of SD's shares over the past 12 months, there is not much good news to report: the stock is down 77.51%, and it has under[per]formed the S&P 500 Index. In addition, the company's earnings per share are lower today than the year-earlier quarter. Naturally, the overall market trend is bound to be a significant factor. However, in one sense, the stock's sharp decline last year is a positive for future investors, making it cheaper (in proportion to its earnings over the past year) than most other stocks in its industry. But due to other concerns, we feel the stock is still not a good buy right now.

    119.   On January 17, 2015, *The Motley Fool* published an article entitled "These 3 Charts Show Why SandRidge Energy Inc.'s Stock Plummeted 69% in 2014: SandRidge Energy's stock was off 69% in 2014 due to oil, debt, and the unappealing prospects of drilling in the Mid-Continent" which reported:

    So much for the long-anticipated turnaround in **SandRidge Energy**'s (NYSE:SD) stock price. After the company sacked founder and CEO Tom Ward in mid-2013, the new management team was expected to hit its stride in 2014 and finally turn the company's stock around. The oil and natural gas producer did outperform expectations in the first quarter, leading the stock to outperform the market through the early summer. Unfortunately, as the following chart shows, things quickly spiraled out of control as the price of oil fell off a cliff.



SD DATA BY YCHARTS.

The company has yet to recover, as the plunge in oil highlighted two well-known risks to the company's business model: its debt load and the fact that it can't grow without high-priced petroleum.

**Cracks begin to emerge**

SandRidge Energy's year really started to unravel with its second-quarter report. While it beat earnings estimates, production was weaker than expected due to power and weather-related disruptions in the company's core Mid-Continent operations. SandRidge also ran into water issues in the Permian Basin as it encountered too much water production and not enough oil on wells it drilled for the SandRidge Permian Trust (NYSE:PER). More cracks in the foundation emerged shortly thereafter as COO David Lawler resigned to become the CEO of BP's (NYSE:BP) U.S. Lower 48 onshore business.

But the primary contributor to the stock's ill fortune in 2014 was the unrelenting sell-off in the price of oil. Sustained low oil prices could prove to be a big issue down the road due to SandRidge's weakening credit profile, which it can't do much about because of the weaker returns it will see in the Mid-Continent in today's price environment.

**Weaknesses turn into worry**

The chart below illustrates the company's weakening credit profile.



SOURCE: SANDRIDGE ENERGY INVESTOR PRESENTATION.

The company's leverage ratio has been trending higher since the second quarter of 2013. Meanwhile, its liquidity has shrunk over the past two quarters. The worry here is that SandRidge eventually could face a liquidity squeeze, which might lead to a default. In fact, energy investors are increasingly worried about the potential for a massive energy bond default wave hitting the industry as early as 2016 if oil prices don't improve.

Investors are also growing more worried about the company's returns in the current oil price environment. As the chart on this next slide shows, SandRidge Energy's well costs mean it can barely make any money drilling new wells at the current sub-$50 per barrel price.



SOURCE: SANDRIDGE ENERGY INVESTOR PRESENTATION.

At that price, it's simply not worth it to the company to continue drilling anywhere near its current rate. That's a problem because the company planned to drill its way out of its debt, as the growing cash flow from new wells would have reduced its leverage ratio over time. Now the company needs

to retrench and only drill its best locations, but that might not be enough to keep its head above water if the price of oil stays in the $50 range for a couple years.

**Investor takeaway**

SandRidge Energy is in a tough spot. It needs high-priced oil to complete its turnaround plan, but no one knows when, or if, oil will rise again. This uncertainty has decimated the company's stock, and its future appears binary: the stock could go to zero if $50 oil stays for a few years, or it could rocket higher on a rebound in oil prices.

120.    On February 10, 2015, *Wichita Business Journal* reported in an article

entitled "Report: SandRidge to cut Kansas, Oklahoma rigs 75 percent" that:

SandRidge Energy Inc. is reducing its oil drilling operations and plans to slash its rig count in Kansas and Oklahoma by 75 percent, Reuters is reporting.

A document obtained by the publication indicates the cuts will be made over the next couple of months as SandRidge, Kansas's largest oil producer, adjusts to market conditions.

The Reuters report states SandRidge (NYSE: SD) plans to reduce to eight its rigs on the Mississippian Lime formation in northern Oklahoma and southern Kansas. That's down from 28.

The production reduction comes with oil prices falling more than 50 percent since June. Prices have crept back up in recent weeks, but operators have already begun slashing production budgets and abandoning plans for new exploration. The economics of existing wells also are being scrutinized.

I detailed how the oil price crash has forced Kansas operators to scale back in a Wichita Business Journal cover story last week.

SandRidge did not respond to email and phone requests for comment for that story.

SandRidge has been heavily invested in the Kansas portion of the Mississippian in recent years - betting much of the success of the company on that play.

In late 2013, the company announced plans to drill 100 new horizontal wells in Kansas in 2014.

Now, the company's future in Kansas is uncertain.

121.   Similarly, On February 10, 2015, Zacks Equity Research noted:

After enduring a weak oil pricing environment for over eight months, upstream and midstream energy operator SandRidge Energy Inc. (SD[1]) has decided to significantly lower its rig count in Kansas and Oklahoma this year, going by a Reuters report.

Following the news, share price of SandRidge Energy nosedived over 10% on the NYSE.

Since last June, West Texas Intermediate (WTI) crude price has plummeted more than 50%. This was primarily owing to plentiful supply of the commodity especially in the face of lackluster global demand. On top of that, most of the analysts are predicting oil price to remain low in 2015 as well.

122.   On February 26, 2015, *The Daily Oklahoman* reported in an article entitled

"SandRidge reports profit, cuts spending by 56 percent" that:

SandRidge Energy Inc. executives said Thursday they have cut the company's 2015 drilling budget by 56 percent and renegotiated a credit facility because of low oil prices that have slowed the industry. The Oklahoma City-based oil producer started the year with 32 drilling rigs, but plans to cut the number to seven by midyear. SandRidge's 2015 capital expenditure budget is $700 million, or 56 percent lower than 2014 levels." We remain intensely aware of the current pricing environment and know that it requires bold steps," CEO James Bennett said in a statement.

"Our 2015 focus is on visibility of improved capital efficiency and balance sheet flexibility. This means we are reducing our capital expenditure program by 56 percent from

2014 levels to $700 million in 2015, and we are now high-grading every new well based on strict cost control, offset well performance and proximity to existing infrastructure." Bennett said the company also renegotiated its credit facility this month. The borrowing limit was set at $900 million and the maximum total leverage ratio was suspended until June 30, 2016.SandRidge said it finished 2014 with $181 million in cash and $900 million available on the credit facility." We have maintained liquidity and financial flexibility, including renegotiating our covenants and reaffirming our borrowing base at $900 million," Bennett said. "These moves, coupled with the recent outstanding additions to our senior management team and board of directors have positioned us for a successful 2015." [sic] 2014performance. Also Thursday, SandRidge reported fourth-quarter profits of $265 million, up from $43.4 million in the year-ago quarter. For the full year, net income was $253 million, up from a loss of $554 million in 2013.Adjusted for one-time expenses, SandRidge earned $44 million, or 8 cents a share, in the fourth quarter, up from $39 million, or 7 cents a share, in the year-ago period. For the full year, the company reported an adjusted net income of $150 million, or 26 cents a share, up from $104 million, or 18 cents a share, in 2013.Revenues slipped to $347 million in the fourth quarter, down from $465 million in the year-ago period and $1.56 billion for full year 2014, down from almost $2 billion in 2013.The earnings results beat Wall Street expectations of break-even earnings and $374 million in revenue in the fourth quarter. Fourth-quarter adjusted earnings before interest, taxes, depreciation and interest expense was $224 million, down from $253 million in the year-ago quarter. For the full year, the it was $873 million, down from $1.02 billion in 2013.SandRidge said it produced 8.1 million barrels of oil equivalent in the fourth quarter, down from 8.2 million in the year-ago period. For the full year, SandRidge produced almost 29 million barrels, down from 33.8 million barrels in 2013. For 2015, SandRidge said it plans to produce between 28 million and 30.5 million barrels of oil equivalent.

123. On March 4, 2015, *Investopedia Stock Analysis* reported in an article entitled "How Is SandRidge Energy Really Looking To Grow?" that:

Mid-Continent-focused driller SandRidge Energy is basically following the playbook of almost every other oil and gas company in the country. It's cutting spending by about half and delivering meager growth in 2015. That's a huge reversal from the go-go days when the company was growing production by double digits. However, what's a bit concerning is that when we look a little deeper into the company's plans for 2015, we find that its growth plan isn't a growth plan at all.

**Drilling down into the plan**

SandRidge Energy's 2015 capital plan calls for the company to spend $700 million, which is a big drop from the $1.66 billion it spent last year. With that cut, the company is targeting 6% production growth, which is well below the 20%-25% production growth the company had been planning to deliver. What's interesting about the plan is that while it does yield growth, that growth is coming from a different commodity than what had been fueling growth over the past few years. CEO James Bennett pointed this out, saying:

> The year's capital program is funded at a level that has oil production versus 2014 slightly down at the midpoint, while gas volumes are up 11%, and NGL is up 20% at the mid-point. Recall that we are not targeting a growth rate for 2015; rather, drilling projects that generate a burdened rate of return at the strip.

As Bennett points out, the company's oil production will be slightly down this year. Instead, the company's growth will be fueled by natural gas and NGLs. However, Bennett notes that this growth isn't because the company is focused on gas, but because that's where it can earn the best return on its investment.

Bennett also pointed out on the call that one reason its gas production is growing is that its oil production faces a much steeper decline rate that's harder to overcome if it's not drilling a lot of wells. Bennett said, "Decline in Permian oil production is the most influential factor in this small drop in oil volumes year over year. We have no capital allocated for Permian drilling in our 2015 budget, and expect to see around

a 30% decline in oil production there." So, because the company isn't spending any money in the Permian Basin, its oil production there is going to slide 30%. Meanwhile, in the Mid-Continent region, where the company is spending money, it has just a slight oil production decline rate, while gas production is increasing. However, this is mainly a function of that fact that its natural gas production doesn't decline as fast as its oil production. Bennett said that the company is "fine with that outcome, since cash flows and returns don't care what the hydrocarbon mix is."

**The real growth number**

All that said, when we dig a little deeper we find that the company's growth plan is really lacking in growth. Bennett told listeners on the company's conference call something very interesting:

We're spending 40% of our budget in the first quarter. So, in the back half of the year, we'll have production declines. And if you want to look at it as a lot of the industry has been, on a fourth-quarter exit-to-exit rate, that would be a mid-teens production decline. So 6% growth year over year, exit-to-exit, a mid-teens decline.

What Bennett is saying here is that the company's production will jump in the first half of the year and then begin to decline at a pretty quick clip. So, if we were to look at the company's production at the end of the fourth-quarter of 2014 and compare it to its production at the end of 2015 that production would have actually declined by a mid-teens rate, as opposed to growing 6%. That's after spending $700 million in capital this year.

What's even more interesting is what would happen if SandRidge Energy didn't spend that capital. Bennett admitted that if SandRidge "just halted drilling altogether for the whole company, you're on a 35% exit-to-exit decline." This tells investors just how important it is to SandRidge, and its peers for that matter, to drill, as the moment they take their foot off the gas production has the potential to fall off a cliff.

**Investor takeaway**

SandRidge Energy was built to grow at a $90 oil price. Now that oil is about $50 a barrel, the company simply can't grow even though it's outspending its cash flow again in 2015. That's a pretty ominous thought for investors, as the company really needs to see the oil price turn around in order to deliver the meaningful growth the company needs to grow out of its debt problems.

124.  On March 24, 2015, *Investopedia Stock Analysis* reported in an article entitled "Is It Time to Give Up on SandRidge Energy?" that:

When oil was over $90 a barrel, there was a lot to like about SandRidge Energy (NYSE: SD). The company had a prime position in an emerging oil play and so it levered up in an effort to fuel rapid production growth. Unfortunately, the company needed $90 oil in order to fuel that growth, and with its price about half that these days, the company's ambitious plans have been upended. Worse yet, it has a pile of debt that's about a billion dollars too high, which is a third of its total outstanding debt. While many of its investors have bailed on the stock over the past year, those still holding on are wondering if it's time to just throw in the towel on SandRidge .

**3 reasons to bail**

If the price of oil stays in its current range for the next few years, then SandRidge Energy is in dire straits. In addition to the aforementioned debt issues, SandRidge has two other issues that could cause its demise. Not only is it still outspending its cash flow, but what little cash flow it does have could weaken further next year once the company's hedges roll off. That gives investors three good reasons to bail on the company.

One of the biggest concerns is the company's growth plans. In 2015 it plans to spend $700 million to grow its production by 6%. While the $700 million capex plan is about a billion dollars less than in previous years, there's still a wide gap between capex and cash flow. The company plans to bridge the gap by selling $200 million in assets while also using its cash on hand and even its credit facility if necessary to pay the bill. That stopgap solution will only work for so long as

its cash flow in 2015 is artificially high, as 92% of its liquids production is hedged. Once those hedges roll off over the next year, the company's cash flow will shrink, leaving it with precious little cash flow to fund new wells in 2016 and beyond. Worst-case scenario is that the company simply halts drilling and its production drops 35% in 2016 due to the steep decline rate of its mid-continent oil and gas wells.

### 2 reasons to hold on

All that said, the company isn't in dire straits just yet. It does have over a billion dollars in liquidity and no bond maturities until 2020. It also has a number of non-core asset sales that it could pursue in order to boost its liquidity further. This gives it time to find a solution to its debt issues if the oil price doesn't improve over the next year.

Furthermore, the company is working on getting its well costs even lower in order to boost its drilling returns. The company is working to cut $600,000 off its $3 million well cost by focusing on becoming more efficient and using more multilateral well designs. If it's successful, the company could boost its per-well returns from the current meager returns its sees at $50 oil to upward of 45% based on the current future strip price for oil. That return would be as good as the company was enjoying when oil was $80 per barrel.

### Investor takeaway

Because time is on SandRidge's side, I don't think now is the time to bail on the company. If the oil price starts to rally later this year, as many expect, it could relieve a lot of pressure on companies like SandRidge . Furthermore, the company is working hard to improve its well returns to get back to the levels it had enjoyed when oil was over $80 a barrel. That said, investor patience is running thin, and the company needs to meet its well cost goal and improve its balance sheet before the end of the year or all bets are off.

125.   On May 6, 2015, SandRidge updated shareholders on its operations and reported its first quarter 2015 results. The Company's press release stated in part that the

Company had a net loss for the quarter of approximately $1.035 billion, and further stated:

> "We continue to reduce activity as we wind down from a rig count of 35 at the close of 2014 to an average of seven rigs in the back half of 2015. While we had capital expenditures of $322 million in the first quarter, we are reducing spending sharply in the second half of this year in line with our guidance of $700 million. This fiscal discipline coupled with operational efficiency gains provide options to improve our balance sheet as we actively evaluate alternatives to bring our cash generation and debt levels in line," said James Bennett, SandRidge's Chief Executive Officer and President.

*  *  *

### Key Financial Results

• Adjusted EBITDA, net of Noncontrolling Interest, was $182 million for first quarter 2015 compared to $169 million in first quarter 2014, pro forma for divestitures

• Adjusted operating cash flow of $146 million for first quarter 2015 compared to $127 million in first quarter 2014

• Adjusted net income of $2.3 million, or $0.00 per diluted share, for first quarter 2015 compared to adjusted net income of $29.5 million, or $0.05 per diluted share, in first quarter 2014

Adjusted net income available to common stockholders, adjusted EBITDA, pro forma adjusted EBITDA and adjusted operating cash flow are non-GAAP financial measures. Each measure is defined and reconciled to the most directly comparable GAAP measure under "Non-GAAP Financial Measures" beginning on page 9.

### Financial / Other Highlights

• Ended the first quarter with $725 million in liquidity and a senior secured leverage ratio of 0.22x times (senior secured debt/LTM pro forma EBITDA)

> •      100% hedged on remaining projected 2015 oil volumes, $60 WTI for remainder of 2015 realizes $82.79 per barrel
>
> •      Mark-to-market hedge position of $251 million as of March 31, 2015
>
> •      Incurred a non-cash impairment charge of approximately $1.1 billion due to a ceiling test write-down, resulting from significant decreases in oil prices beginning in the latter half of 2014 and continuing into 2015

126.   On May 7, 2015, *The Daily Oklahoman* reported in an article entitled "Low commodity prices lead to energy company losses" that:

> Low oil and natural gas prices battered Oklahoma City energy companies Wednesday, leading to quarterly losses at three of the city's publicly traded producers.  Chesapeake Energy Corp., Continental Resources Inc. and SandRidge Energy Inc. all reported net losses in the first quarter as tumbling commodity prices over the past nine months led to lower revenues, and accounting charges led to deeper losses at Chesapeake and SandRidge .  Continental Resources Inc. Continental Resources posted the smallest loss of the three companies. Continental was most exposed to commodity prices after selling the hedges that could have boosted its oil sales prices, but it benefited from increased production and a much smaller non-cash accounting charge." Our teams have done an outstanding job making the necessary adjustments to achieve our 2015 goals of aligning capital expenditures with cash flow by midyear, reduce expenses across the board, and maximize returns on every dollar we spend. . . . SandRidge Energy recorded a net loss of just more than $1.03 billion, led by a noncash asset impairment charge of $1.08 billion. The results translate into a loss of $2.19 a share, down from a loss of $136 million, or 31 cents a share, one year ago. Adjusted for one-time expenses, SandRidge posted a profit of $2.3 million, or less than 1 cent a share, down from $29.5 million, or 5 cents a share in the year-ago quarter.  "Our operational teams continue to execute by maintaining our cost leadership in the Mid-Continent, bringing wells online with initial production rates that exceed our type curve and by further

improving our innovative multilateral programs," CEO James Bennett said in a statement.  Earnings before interest, taxes, depreciation amortization were a loss of $851 million, down from a gain of almost $63 million one year ago. Revenues slipped to $215 million, down from $443 million. Total production increased to 87,700 equivalent barrels per day, up from 79,200 one year ago. Oil and natural gas liquids represented 50 percent of total production. ***Without hedges, SandRidge would have received $45.35 a barrel. But including hedges, the company sold its oil for $88.23 a barrel, just 8 percent less than $95.88 one year ago.*** [emphasis added]

127.   On May 8, 2015, *The Daily Oklahoman* reported in an article entitled

"Grand jury investigates SandRidge Energy" that:

> A grand jury is investigating whether SandRidge Energy Inc. violated federal antitrust law, the Oklahoma City oil and natural gas producer said in a regulatory filing Thursday. The investigation is related to the purchase or lease of land, oil or natural gas rights in and before 2012, SandRidge said." We continue to work with the Department of Justice and their investigation," Jeff Wilson, SandRidge's vice president of government and public affairs told The Oklahoman on Thursday.  SandRidge previously disclosed that in December 2013 it received a subpoena from the justice department concerning the federal investigation. On April 7, the Justice Department told the company that the grand jury in the western district of Oklahoma is involved, SandRidge said in Thursday's regulatory filing.

128.   On May 8, 2015, Moody's downgraded SandRidge's CFR to B3, and

downgraded its Probability of Default Ratings.  Moody's noted:

> The B3 CFR reflects growing risk for SandRidge's business profile because of high financial leverage and worsening credit metrics as its existing hedges roll off and the company remains significantly less hedged for 2016. Moody's expects debt to average daily production to approach $45,000 per barrel of oil equivalent (boe) and retained cash flow (RCF) to debt to be less than 10% in 2015 and worsening thereafter.

> The CFR also considers the elevated risk that SandRidge will
> not have the ability to grow out of its weak leverage metrics
> as capital expenditures are cut, and as its retained cash flow
> remains weak due to low netback per boe and high interest
> expense burden.

129.    On May 15, 2015, S&P lowered SandRidge's corporate credit rating after it swapped common stock for $50 million in debt.   S&P placed SandRidge on "CreditWatch" with negative implications, saying it would consider dropping the credit ratings to or near default levels if the stock price does not jump up by the next week.  The move came after SandRidge said it entered into an exchange agreement with an existing holder of $29 million of its 7.5 percent senior notes due 2021 and of $21 million of its 8.125 percent senior notes due 2022. In exchange for the notes, SandRidge issued more than 28 million shares of stock.  At Thursday's closing price of $1.33 a share, the deal was worth slightly more than $37 million.  S&P stated,

> we believe that even if the current exchange does not qualify
> as distressed under our definition, the deal indicates that, in
> order to reduce its substantial debt burden, SandRidge might
> enter into additional exchanges that we would view as
> distressed.

130.    Also on May 15, 2015, *24/7 Wall St.* reported in an article entitled "SandRidge Goes from Very Bad to Far Worse" that:

> It looks like SandRidge Energy Inc. (NYSE: SD) can't catch
> any breaks. Analysts and investors alike are not responding
> well to any of the moves that this company is making. Last
> week SandRidge was downgraded by Credit Suisse after its
> earnings and now Standard & Poor's has decided to
> downgrade its credit.
>
> In the first quarter SandRidge had an adjusted net loss of less
> than $0.01 per share on revenue of $215.3 million. At the

same time, SandRidge produced 7.9 million barrels of oil equivalent (MMBoe), 50% of which was crude oil and natural gas liquids. First-quarter production averaged 87.7 thousand barrels of oil equivalents per day (MBoep/d). This represents a 1% decrease in average daily production from the full fourth quarter of 2014.

Credit Suisse's analysts Arun Jayaram and Bryan Baritot had an Underperform rating for SandRidge and a price target of $0.80, implying downside of just over 50% from current prices. Note that this call by Credit Suisse was made on May 7.

The highlight of the first quarter was the significant cash burn, with SandRidge's net debt balance increasing by an incredible $345 million sequentially in a period when the company benefited from $137 million in cash hedging gains. As a result of the significant cash burn, management signaled that it was "evaluating alternatives to bring our cash generation and debt levels in line." Credit Suisse suggests that SandRidge might be considering some sort of equity raise or other type of near-term financing.

When Credit Suisse made the call, shares of SandRidge were down about 8% at $1.63, and since that time shares dropped roughly 25% to the most recent closing price of $1.33.

It would appear that Credit Suisse was right in its assumption of SandRidge raising capital. According to the company's most recent SEC filing:

> On May 14, 2015, SandRidge Energy, Inc. (the "Company") entered into an exchange agreement with an existing holder (the "Holder") of the Company's 7.5% Senior Notes due 2021 (the "2021 Notes") and 8.125% Senior Notes due 2022 (the "2022 Notes"), pursuant to which the Company agreed to issue to the Holder (a) 16,046,666 shares of the Company's common stock, par value $0.001 per share ( "Common Stock") in exchange for an aggregate $29,000,000 principal amount of the 2021 Notes and 257,778 additional shares of Common Stock as payment for the interest accrued thereon since the last interest payment date and (b) 11,620,000 shares of Common Stock, par

value $0.001 per share, in exchange for an aggregate $21,000,000 principal amount of the 2022 Notes and 107,431 additional shares of Common Stock as payment for the interest accrued thereon since the last interest payment date. The exchange is expected to close May 19, 2015.

Concurrently, SandRidge's credit rating was downgraded by Standard & Poor's to CCC+ from B in regards to the debt swap that the company stated in its filing.

According to Standard & Poor's:

We note that the exchange reduces the company's approximately $3.4 billion of debt by $50 million, marginally improving leverage. However, we believe that even if the current exchange does not qualify as distressed under our definition, the deal indicates that, in order to reduce its substantial debt burden, SandRidge might enter into additional exchanges that we would view as distressed. The negative CreditWatch placement reflects the possibility that we would lower ratings if the company's stock price is below the level required for investors to receive the promised amount on the original securities at the close of the transaction.

On Friday afternoon, SandRidge shares were down about 10% at $1.20. The stock has a 52-week trading range of $1.13 to $7.43.

131.   On May 18, 2015, *Investopedia* reported in an article entitled "SandRidge's

Debt Situation Isn't Getting Better" that:

As of the end of the first quarter, SandRidge Energy**'s** (NYSE: SD) net long-term debt stood at $3.4 billion. That's up from roughly $3.0 billion from just the end of the fourth-quarter, as the company spent $322 million on capex in the first-quarter. While that capex spend will moderate in 2015, the company's debt picture isn't getting any better despite the fact that it recently agreed to a debt-for-equity swap with one of its bondholders. This is a company that really needs to do something before its debt situation grows any worse.

**A drop in the bucket**

SandRidge Energy's net debt has continued to balloon as the company burned through its cash position to drill new wells. In just the past year alone it burned through its more than $800 million cash position and has now borrowed $175 million on its previously undrawn $900 million credit facility. Clearly, the company needed to do something to halt the build in its debt, which is why it cut about a billion dollars out of its 2015 capex spending plan over last year's level.

However, cutting capex isn't enough as the company really needed to address the ballooning debt itself. It finally did something just last week as it swapped $50 million in debt plus interest for nearly 28 million shares of its stock. While that was at least a step toward reducing its debt it was just a drop in the bucket as it represented just 1% of its outstanding borrowings.

Further, the move didn't go over well with investors, which sold the stock down double-digits upon hearing the news. Meanwhile, credit rating agency Standard & Poor's cut the company's credit rating from B to CCC+, which is seven levels below investment grade. The reason for the cut, according to Standard & Poor's, is the fact that the transaction might be viewed by the market as a distressed exchange, and even if it is not, future swaps might be viewed that way.

**Something needs to be done... now**

The timing of the exchange is rather odd. SandRidge has boasted in the past that it has ample liquidity and no near-term debt maturities. That gave the company time to deal with the problem. It was expected to use that time to find a buyer for some of its non-core assets as well as possibly monetizing its saltwater disposal system via an IPO of an MLP that would hold the assets. While these sales aren't off the table, it's clear that the company didn't see these as the only answer to paring down its debt.

The question that remains is what the company actually does plan to do to reduce its debt. Its original plan was to use high oil prices to drill its way out of debt, however, given where oil prices are now that option is basically off the table.

Because of that the company doesn't really have a whole lot of options other than selling assets or engaging in additional debt-for-equity exchanges. Neither is really compelling at the moment because the value of oil and gas assets are down due to weak oil prices, while SandRidge's stock has cratered for the same reason as well as the fact it has so much debt.

**Investor takeaway**

The company is entering a real critical year. It absolutely needs to stop overspending its cash flow to drill more wells. Further, it needs to meaningfully reduce its debt, which CEO James Bennett said on SandRidge's fourth-quarter conference call that, if lower oil prices are the new normal then the company would "probably want to remove $1 billion of debt from the balance sheet." That's a lot of debt that isn't going to easily chip away with meager debt-for-equity swaps.

132. Similarly, on May 18, 2015, *Oil Daily* reported in an article entitled "Struggling SandRidge Resorts to Debt-for-Equity Swap" that:

US exploration and production companies may be breathing a sigh of relief as oil prices hold roughly 40% above their January lows, but many producers' balance sheets continue to show signs of strain.

SandRidge Energy is the latest US independent ***to go to desperate lengths to reduce debt and try to put its finances on a sounder footing*** (OD May6'15 ).

The Oklahoma-based company has agreed to issue more than 28 million new shares in exchange for retiring $50 million in debt maturing in 2020 and 2021.

The arrangement means that SandRidge will dilute its outstanding share count by nearly 6% for the privilege of reducing its $3.4 billion in debt by a little more than 1%.

RBC Capital Markets analyst Scott Hanold estimates the exchange will only marginally improve SandRidge's trailing 12-month debt-to-Ebitda (earnings before interest, taxes, depreciation and amortization) multiple -- lowering it to 4.2 from 4.3.

*Companies with a debt-to-Ebitda multiple above 3 are typically viewed as highly leveraged, with readings above 4 regarded as particularly stretched.*

*Hanold had estimated earlier this year that SandRidge was on pace to see its debt-to-Ebitda ratio rise to almost 9 by year-end 2016.*

Like many US E&P firms, SandRidge has responded to the steep fall in oil prices by aggressively reining in its drilling and completion activity in an effort to close a significant gap between its spending and incoming cash.

SandRidge spent $322 million -- or 46% of its $700 million budget for 2015 -- just in the first quarter of the year. Robust hedges provided a significant boost to revenues, but the company still generated just $90 million in operating cash flow for the quarter.

The resulting gap forced SandRidge to burn through its cash, which fell from $181.2 million at year-end 2014 to just $11.8 million at the end of March. The company also began drawing down funds from its senior credit facility.

Chief Executive James Bennett told analysts earlier this month that the gathering storm clouds had compelled SandRidge to "actively consider many alternatives to reduce total debt."

The company ultimately opted to pursue a debt-for-equity swap, but that has put a big dent in SandRidge's credit rating.

Standard & Poor's has already downgraded SandRidge two notches, from B to CCC+, but adds that SandRidge risks slipping all the way into "selective default" if the swap closes on May 19 with bondholders receiving shares worth less than the debt securities they are trading in.

S&P Director Ben Tsocanos tells *Oil Daily* that based on the number of shares being exchanged, SandRidge's share price would need to claw its way back to around $1.80 for bondholders to receive full value.

> SandRidge's New York-listed shares have been crushed since news of the swap became public, falling around 20% over two days to $1.20.
>
> If the selective default tag is indeed slapped on SandRidge, it will have a companion in Halcon Resources, which also recently resorted to several debt-for-equity swaps (OD May5'15 ). [Emphasis added.]

133. On May 20, 2015, S&P lowered its corporate credit rating on Oklahoma City-based SandRidge to 'SD' (selective default, noting that an obligor has selectively defaulted on some obligations) from 'CCC+' (noting that an obligor is currently vulnerable, and is dependent upon favorable business, financial, and economic conditions to meet its financial commitments).

134. On May 28, 2015, S&P raised its corporate credit rating on Oklahoma City-based SandRidge from 'SD' to 'CCC+' because the Company.  S&P made this change in light of SandRidge's announcement of its proposed $1 billion senior secured second-lien note offering to fund general corporate purposes, including repaying credit facility borrowings and higher capital spending."

135. On May 29, 2015, *Midnight Trader Live Briefs* reported in an article entitled "SandRidge Energy Enters Transactions to Increase Liquidity to $1.4 Bln" that:

> SandRidge Energy (SD) said Friday it is entering into transactions that will increase its liquidity to approximately $1.4 billion, including a revised revolving-bank-credit facility containing leverage covenants less restrictive than its current credit facility and a private offering of $1.25 billion of senior secured second-lien notes.
>
> The company also noted that concurrent with the issuance of its second-lien notes, it will revise its first-lien credit facility, lowering its initial borrowing base availability to $500

million from $900 million, subject to maintenance of a first-lien leverage ratio of not more than 2.0 times and a minimum current ratio of at least 1.0 times.

CEO James Bennett said the company expects the transactions to "provide us the flexibility and liquidity that lets us continue to develop and produce our attractive asset base and create shareholder value," adding that the company "will continue to pursue other deleveraging transactions."

Bennett also said the company's cost-reduction efforts "are moving forward rapidly." He added: "Current well costs are significantly lower than costs incurred in 2014 and we continue to expect to achieve our 2015 cost reduction goal in the second half of the year."

136. On June 2, 2015, *Investopedia Stock Analysis* reported in an article entitled

"5 Things SandRidge Energy Wants You to Know" concluded that:

SandRidge Energy's story is really one of two completely different companies. Operationally, it's doing an exceptional job of cutting costs and hitting its targets. However, financially it's another story, as the company has too much debt for the current oil price, leaving it scrambling to boost its liquidity so that it can take full advantage of the time it has to address the debt situation. Despite having time on its side, investors want to see action very, very soon.

137. On June 5, 2015, *The Daily Oklahoman* reported in an article entitled

"SandRidge focuses on cutting costs, raising stock price" that:

SandRidge Energy Inc. CEO James Bennett on Thursday told shareholders he is unhappy with the company's struggling share price and that he is hopeful the company's cost-cutting efforts soon will lead to a stock price rebound." Our share price has underperformed," he said at the Oklahoma City-based oil and natural gas company's annual shareholder meeting. "It's not acceptable. We need to focus on remedying it."  SandRidge shares slipped another 6 cents, or 4.9 percent, to $1.17 Thursday.

The price is down 84 percent from its 52-week high set last June, when oil was trading for more than $100 a barrel. Bennett attributed much of the recent price drop to commodity prices. One year ago, SandRidge's oil in the ground was valued at about $5.5 billion. With today's prices, that valuation has dropped to about $3 billion. The $2.5 billion loss, divided by SandRidge's 500 million common shares is about $5 a share, roughly what the company is down over the past year. "We are a leveraged E&P (exploration and production) company," Bennett said. "Highly leveraged companies are going to be more impacted by commodity prices." Still, Bennett said there is plenty the company can do to strengthen the share price." We have to continue to execute, to find the resource in the ground and bring it out at a much greater return," he said. SandRidge already has reduced well costs from an average of $3.5 million one year ago to about $3 million today. Bennett said he hopes the number will drop to $2.4 million by the end of this year." We've made very targeted operational improvements to allow us to survive and thrive in a $60 (a barrel) oil environment," he said. A little less than half of the savings so far has come from services companies lowering their costs. "The other half is durable savings and durable efficiencies, including changes in processes, changes in design, changes in the way we build pads and using more multilateral and long laterals," Bennett said. "In a rising cost environment, there may be inflation in service costs, but our durable savings will continue." Reduced costs already have lowered the oil price SandRidge needs to be profitable." We're positioned now with our new cost structure to generate the same rates of return at $60 oil as we did with $90 oil a year ago," Bennett said. "We don't project a correction in the next 12 months. We're planning on $55 oil. There's a couple of banks that are projecting $85. I hope they're right, but we're setting up our business to run on $55 oil." SandRidge has hedged almost all of its 2015 production. Reduced costs and gradually improved oil prices have executives considering locking in the price for future production. "It's a function of our well costs," Bennett said. "If our well costs were still $3 million, my answer wouldn't be the low $70s. if we can get our well costs to $2.4 million or even lower, then we might want to do it at the mid $60s. So it depends on our well costs, but the high $60s and low $70s is an area where it's interesting for us. "To help reduce

costs and increase production, SandRidge also is expanding its focus beyond its primary Mississippian formation target. The company increasingly is drilling the shallower Woodford and Chester rock layers, which tend to produce more oil than the natural gas-heavy Mississippian. "We have about 700,000 acres on our focus area. The Woodford and Chester opportunities we've talked about publicly have all been on our existing acreage," Bennett said. "There's a lot to do on our existing acreage. But we are looking at things that are adjacent or close by." SandRidge last week secured $1.25 billion in debt financing, giving the company the cash flow its needs to wait out lower oil prices, Bennett said. ***"The key is liquidity," he said. "We have to be most focused on liquidity. Liquidity is paramount in our business. If commodity prices go down, we will be very happy to have this cash. If commodity prices return, we will be happy to have money to invest. We have high-return projects to put this in."*** While the deal gave the company the cash it needs today, it added to SandRidge's already large debt burden. "***Our debt is too high for $60 oil,***" Bennett said. He said the company is looking at ways to reduce debt, including asset sales and other financial arrangements." There are a lot of ways to manage that," Bennett said. "We have time and flexibility. But because we have a lot of time doesn't mean we have a lack of urgency. There is a high sense of urgency." [emphasis added]

138.    On June 10, 2015, *The Deal Pipeline* reported in an article entitled "How to

separate the risky from the safe among oil and gas companies" that:

> Now that oil prices seem to be steadying at around $60 per barrel, investors may be tempted to dip back into oil and gas stocks. Anyone feeling that urge needs to consider what constitutes risk in the industry. In a report Tuesday, investment banking boutique KLR Group LLC said it measures risk on both the operational level, specifically what a company spends versus what it produces, and the financial level, including how much debt it has compared with its earnings before interest, tax, depreciation and amortization. So which companies have the highest and lowest risk business models?

Let's start with the lowest risk companies first. . . . So where's the highest risk? That list includes SandRidge Energy Inc. (SD), Comstock Resources Inc. (CRK), W&T Offshore (WTI), Goodrich Petroleum Corp. (GDP), Energy XXI Ltd. (EXXI) and Halcan Resources Corp. (HK). The names aren't all that surprising, as they're all struggling with high debt loads that were taken on during better times. SandRidge CEO Jim Bennett has said the company is considering several options to reduce its indebtedness and boost liquidity, from asset sales to forming master limited partnerships that would hold some of its assets (its properties are mostly in the Mid-continent).

139. On June 12, 2015, *Dow Jones Factiva* reported in an article entitled "Energy, Mining Distress Drives Defaults -- Market Talk" that

Trouble in the energy and metals and mining industries pushes the U.S. high-yield default rate to a new monthly high, according to Fitch Ratings. The nine defaults in May--the highest number of defaults in a month since October 2009— all came from those industries, the ratings agency says. The companies that defaulted last month include Magnetation LLC and Patriot Coal, which filed for chapter 11 bankruptcy, as well as SandRidge Energy and Warren Resources Inc., which completed distressed exchanges. So far this year, 28 companies have defaulted on $22.8B in high-yield debt.

140. On June 24, 2015, Omega Advisors' Lee Cooperman filed a 13G with the SEC disclosing that he no longer owns a stake in the Company. At the end of the first quarter, Cooperman had owned 24.3 million shares. He had recently been a staunch defender of the Company's prospects until his divestment of shares.

141. On June 28, 2015, *Seeking Alpha* reported in an article entitled "SandRidge Energy Buys Some Time" that:

**Summary**

Lending syndicate lowered revolving credit line from $900 million to $500 million.

SandRidge took out $1.25 billion from private equity at rate of 8.625% and with a maturity in 2020.

Shares of SandRidge fell below $1.00 recently.

Earlier this month SandRidge (NYSE:SD) Energy posted some pretty big news. In a private debt offering, SandRidge posted a $1.25 billion senior bond offering at 8.75%, with a maturity date of 2020. Also, and not coincidentally, SandRidge announced that the credit syndicate backing the company's revolving credit line just reduced the line's capacity from $900 million to $500 million.

Up until now, SandRidge was one of the most endangered of the independent oil and gas companies in the US. The company had recently run out of cash and was still burning through cash at a decent rate. Furthermore, SandRidge operates almost entirely within the Mississippian Lime unconventional drilling play, which is perhaps the most marginal of the unconventional drilling plays still in operation.

This article goes over Sand Ridge's recent debt moves and what they mean for the company.

**A tough spot**

To understand why SandRidge took on such costly debt, one has to first understand the circumstances the company was in before it made this deal.



*Data by Morningstar.*

The above chart illustrates SandRidge's cash position over the last few quarters. At current commodity prices, SandRidge's NGL and associated dry gas operations are about breakeven. Crude oil operations, at $55 WTI, spins off about $366 million in operating cash flow, according to some 'back-of-the-envelope' calculations in a previous article.

At the same time, in 2015, SandRidge needs about $700 million in capital expenditure to keep production levels well-maintained. SandRidge also has another $200 million in interest costs to pay per year, new debt not withstanding. Subtracting capex and interest costs from operational cash flow, we get a 'cash burn' rate of $534 million per year. To make matters worse, creditors were lining up to reduce the revolving debt from $900 million to just $500 million. SandRidge needed to do something. Many thought an asset sale was imminent, but instead SandRidge took out some costly senior notes with a private equity partner. Make no mistake, SandRidge did this private equity deal because it had to.

How the deal effects things

Basically, SandRidge swapped some of its low-interest, variable revolving capacity for an 8.675%-rate senior note due in 2020. The implied interest cost for this note comes out to $109 million per year. For an accurate picture of the new cash flow situation, we must add that $109 million to interest costs.

So let's do another 'back-of-the-envelope' calculation. Assuming $55 WTI and $2.75 per mcfe of dry gas, SandRidge will burn though cash at a rate of about $640 million per year. Now, however, SandRidge has $1.25 billion in cash and at least $300 million in revolving credit capacity. Assuming SandRidge will try to not touch that credit line, then this liquidity should last for two years at this run rate, all other things being equal.

As we know, many things can happen in two years, so I really believe SandRidge has really bought itself a good bit of time. In my last article I estimated that SandRidge would need $70 WTI in order to be cash-flow neutral, and I stick to that belief.

I do believe that WTI will reach and sustain $70 by the time SandRidge runs out of cash, so this deal probably will end up being the 'life saver' which SandRidge needed. However, the company paid for this in terms of financial flexibility.

**The cost of doing business**

In doing this high-rate, medium-term bond, SandRidge has saddled itself with higher interest expenses, which will trade away manueverability if WTI gets high enough to warrant an expansion in rig count. Furthermore, this rising debt load and added 2020 obligation greatly increases the prospect of further shareholder dilution.



*Maturities schedule BEFORE addition of latest debt: By now $1.7 billion is due in 2020 and the credit facility has been removed to $500 million.*

At some point SandRidge will probably do something about its 2020 debt obligations as that year approaches. That event, however, could be at least a couple years off, and if debt markets brighten their mood to shale drillers again, then SandRidge could refinance large chunks of its debt. Overall, however, SandRidge isn't really in control of its own destiny, and that's exactly why shares of this company dropped below $1.00 for the first time.

I continue to stay away from SandRidge . Even if the company makes it through this and if WTI returns to $70, there are names better-suited for an eventual recovery, in terms of both finance and producing acreage. In my opinion, SandRidge remains too risky and I much prefer shale names in the Eagle Ford and the Permian.

142.   On July 3, 2015, *ZeroHedge.com* reported in an article entitled "Shale

Drillers About To Be 'Zero Hedged' As Loss Protection Expires" that:

In many ways, the US shale industry is emblematic of why failing to normalize monetary policy after seven years of largesse can be extremely dangerous.

As discussed at length in these pages and then subsequently everywhere else, access to cheap cash via capital markets allows otherwise insolvent producers to keep drilling even as prices collapse, creating what are effectively zombie companies (to use Matt King's words) on the way to delaying the Schumpeterian endgame and embedding an enormous amount of risk in HY credit by flooding the market with supply just as demand from investors (who are delirious from hunger after being starved of yield by the Fed) peaks and secondary market liquidity continues to dry up.

This dynamic has served to create a supply glut in a number of industries and has suppressed commodity prices in a self-feeding deflationary loop.

Thanks to SEC rules on how drillers are required to value their reserves, producers are effectively forced to overstate the value of their O&G businesses by nearly two-thirds, which can lead unsophisticated investors who don't bother to read the 10K fine print to believe that the businesses are healthier than they actually are.

Furthermore, the next round of revolver raids for the industry isn't due until October, meaning investors may also believe the industry has easier access to liquidity than it actually does. As a reminder:

Figure 1: Bank outlook for oil & gas sector delinquencies and charge-offs over rest of 2015

| Outlook | Percent |
|---|---|
| Loan quality is likely to improve substantially | 0 |
| Loan quality is likely to improve somewhat | 2 |
| Loan quality is likely to remain around current levels | 39.2 |
| Loan quality is likely to deteriorate somewhat | 58.8 |
| Loan quality is likely to deteriorate substantially | 0 |
| Total | 100 |

Source: UBS, Federal Reserve

Figure 2: How are banks mitigating risk of loan losses from oil & gas sector?

| | % Banks |
|---|---|
| Restructuring outstanding loans | 82.3 |
| Reducing the size of existing credit lines | 80.4 |
| Tightening underwriting policies | 70.6 |
| Requiring additional collateral | 70.6 |
| Enforcing clauses or covenants to limit draws on existing credit lines | 49 |
| Tightening underwriting policies for loans to other sectors | 29.4 |

Source: UBS, Federal Reserve

As if all of the above weren't enough, there's yet another reason why the shale default cascade has thus far been forestalled, giving many the impression that perhaps a "crude" awakening (pardon the terrible pun) has been averted: hedges.

Here's Bloomberg with more on why some US shale drillers may soon be *zero hedged* (ahem):

> *The insurance protecting shale drillers against plummeting prices has become so crucial that for one company, SandRidge Energy Inc., payments from the hedges accounted for a stunning 64 percent of first-quarter revenue.*
>
> **Now the safety net is going away.**
>
> *The insurance that producers bought before the collapse in oil -- much of which guaranteed minimum prices of $90 a barrel or more -- is expiring. As they do, investors are left to wonder how these companies will make up the $3.7 billion the hedges earned them in the first quarter after crude sunk below $60 from a peak of $107 in mid-2014.*
>
> *"A year ago, you could hedge at $85 to $90, and now it's in the low $60s," said Chris Lang, a senior vice president with Asset Risk Management, a hedging adviser for more than 100 exploration and production companies. "Next year it's really going to come to a head."*
>
> **The hedges staved off an acute shortage of cash for shale companies and helped keep lenders from cutting credit lines, many of which are up for renewal in October. With drillers burdened by interest payments on $235 billion of debt, $89 billion of it high-yield, a U.S. regulator has warned banks to beware of the "emerging risk" of lending to energy companies.**
>
> **Payments from hedges accounted for at least 15 percent of first-quarter revenue at 30 of the 62 oil and gas companies in the Bloomberg Intelligence North America Exploration and Production Index.** *Revenue, already down 37 percent in the last year, will fall further as drillers cash out contracts that paid $90 a barrel even when oil fell below $44.*

> *For SandRidge and other drillers, the hedges, required by some lenders, gave them enough time to cut spending. Costs in shale fields have fallen by 20 to 30 percent and productivity has increased as producers moved rigs to the most prolific regions. Producers were able to raise about $44 billion in equity and debt in the first quarter, according to UBS AG.*
>
> ***"That postponed the day of reckoning,"*** *said Carl Tricoli, co-founder of private-equity firm Denham Capital Management.*
>
> *At Goodrich Petroleum Corp.,* ***hedges accounted for 35 percent of revenue in the first three months of 2015.*** *Most of its insurance runs out at the end of the year, company records show.*

In short, the last line of defense against terminal cash burn for the beleaguered US shale complex is about to fall and when it does, it's going to take bank credit lines down with it.

This means October is the expiration date for heavily indebted US drillers and perhaps for HY credit as well, because once the defaults begin in earnest and HY spreads start to blow out, the BTFD-ing retail crowd will head for the exits, triggering a very non-diversifiable, unidirectional flow for bond fund managers who will then be forced to hold their noses and dive into the ever-thinner secondary corporate credit market.

It is precisely at that point when everyone's worst nightmares about shrinking dealer inventories and illiquid credit markets will suddenly be realized.

143.    On July 6, 2015, *Seeking Alpha* reported in an article entitled "SandRidge Abandon All Hope, Ye Who Enter Here 2.0" that

Summary

- Since penning a research note calling out that I believe SandRidge Energy (SD) is worth exactly zero the E&P's shares have absolutely plummeted.

- SandRidge most recently closed at $0.76/share or down 36% from my call.

- For those poor souls who refused to "abandon all hope, ye who enter here" there are other data points even more depressing and even more damning than those prior listed.

- Yes, I also consider the following more damning than that of which are represented by the circling-the-drain equity price.

Since penning a research note calling out that I believe SandRidge Energy (NYSE:SD) is worth exactly zero the E&P's shares have absolutely plummeted.

SandRidge most recently closed at $0.76/share or down 36% from my call. Still, for those poor souls who refused to "abandon all hope, ye who enter here" as I suggested they do there are other data points even more depressing and even more damning than those in my prior article. Yes, I also consider the following more damning than that of which are represented by the circling-the-drain equity price.

**Leon Cooperman Exits:**

Longtime SandRidge backer, apologist, excuse maker, and double-downer Leon Cooperman has exited his position in the company. Cooperman disclosed having zero shares in SandRidge in a recent Form 13-G filing:

\* \* \*

Kamakura Corporation, a risk management software, information, and consulting firm, whose CEO Donald van Deventer runs an Instablog on Seeking Alpha reports that *SandRidge's forward looking 12 month default probability rate now sits at 22.89%. This rate is up ~5% from an early-June reading of ~17.5% and up exponentially from an early-May reading of under 5%:*

\* \* \*

Of course, I believe this risk analysis to be extremely forgiving of SandRidge's fatal flaws in that I have a forward

looking 12 month default probability rate of 100%. Still, the fact that a well-known and reputable risk management firm that specializes in stress testing, credit risk analysis, and default probabilities has deemed SandRidge to have a one in five chance (as of most recent reporting - you can see a clear trend of deteriorating long-term viability in the chart above) of default within 12 months is not productive to the non-bankruptcy/bull thesis for the company.

**Bloomberg Reports: SandRidge and the "Vanishing Safety Net":**

"SandRidge, the Oklahoma City-based producer, had about 90 percent of its oil and natural gas liquids output hedged in early 2015, according to a regulatory filing. Next year, the hedges cover less than a third. SandRidge stock traded yesterday at 85 cents, down 88 percent in the last year. More than $3 billion of its bonds are trading at 62 cents on the dollar or less… SandRidge issued $1.25 billion in bonds last month, which gives the company the liquidity it needs… for SandRidge and other drillers, the hedges, required by some lenders, gave them enough time to cut spending… that postponed the day of reckoning… the U.S. Office of the Comptroller of the Currency has expressed concern that the banks it supervises be more careful about lending to energy firms (SOURCE: "Shale Drillers' Safety Net Is Vanishing")"

So this is all public information and to industry followers all this is widely known information but the fact that Bloomberg is now getting behind that SandRidge has a *massive exposure to the spot pricing markets heading into 2016* is the straw that should break the camel's back. Yes, I know SandRidge Perma-Bull from prices way above - I know. SandRidge "is prepared for $55 oil for the next ten years" or whatever story management is making up these days.

Guys, when I say storytelling and making things up I mean exactly that. This is a management team who has repeatedly been unable to determine its own all-in costs of production (SOURCE: Q3/14 investor call) and who has in the past literally made up its returns based on these sliding, changing when convenient all-in costs. Reading the Q3/14 investor call transcript is difficult to finish in that it's just so embarrassing for everybody involved. How am I to trust the story that

SandRidge management is selling today, that there's "nothing to see here, move along" when clearly nobody else does? Have you seen the share price? Does that look like "nothing to see here, move along"? I don't think it does.

So what does Bloomberg, who is always late to the game and in-line with this historical trend is late to the game now, have to do with anything? Bloomberg bringing the SandRidge hedging time bomb to the public masses should bring unprecedented heat, or at least conversation, to the question of why banks continue to lend/be accommodating to the E&P's that they have visibility into a horrible 2016. Further of why banks are so "risked up" with allowing E&P's like SandRidge to continue to destroy their balance sheets in the way that SandRidge has (levering up further, depleting reserves at uneconomic levels, etc.).

But hey, I get it SandRidge Bull - "nothing to see here, move along".

144. On July 6, 2015, *News Bites* reported in an article entitled "NewsOK, L.L.C.: Energy companies lead quarter's best-, worst-performing stocks 05 July 2015" that:

It's been a tough year for the oil and natural gas sector.

While the price of oil has improved a bit, it's been stuck in a narrow range for much for the past six weeks, and the price of natural gas continues to languish seven years into a bear market. As a result, energy companies claimed all of the three best-performing and three worst-performing Oklahoma stocks in the second quarter.

While the prices of some energy stocks have improved over the past few weeks and months, nearly all are well off their 52-week highs, most of which were set last summer when oil was trading for more than $100 a barrel.

SandRidge Energy Inc.

SandRidge Energy Inc. experienced the biggest percentage drop in the quarter, down 51 percent, or 91 cents, to 88 cents

a share. The Oklahoma City-based oil and natural gas producer's stock price is off 89 percent from its 52-week high of $7.05 a share.

The third quarter hasn't started out any better for SandRidge. The stock price finished the shortened trading week at 76.21 cents a share.

"A lot of producers are getting killed right now, especially SandRidge, with its high debt and not enough income," said Greg Womack, president of Womack Investment Advisers in Edmond. "It's hard to create income if you can't spend the money to go drill. They have good assets, but high debt and a struggling budget for exploration has created a tough time for them."

SandRidge's assets also are limited to one field in northern Oklahoma and western Kansas.

145.   SandRidge's bond prices also tumbled, demonstrating that the debt markets believed SandRidge was an exceedingly risky investment.  For example, in July of 2015, one of SandRidge's bonds (N:SD3916827) plummeted US$14.79 (or 33.6%) to $29.21, *trailing 99.4% of all bonds.*  As a July 26, 2015 article in *The Virginian-Pilot* (Norfolk, VA.) entitled "Wall Street lenders grow impatient with shale revolution" reported that:

Halcon Resources almost ran into trouble with its banks in June 2013. And again in March 2014. And in February 2015.

Each time, the shale driller came close to violating debt limits set by its lenders, endangering a credit line that provided as much as $1.05 billion in much-needed cash. Each time, Halcon's banks, led by JPMorgan Chase & Co. and Wells Fargo & Co., loosened their restrictions, allowing Halcon to keep borrowing.

That kind of patience may be coming to an end. Bank regulators have issued warnings on the risks involved in lending to U.S. drillers, threatening a cash crunch in an industry that's more dependent than ever on other people's money. Wall Street has been one of the biggest allies of the

shale revolution, bankrolling thousands of wells from Texas to North Dakota. The question is how that will change with oil prices down by half since last year to about $50 a barrel.

\* \* \*

Now the appetite for that debt is dwindling. Bonds have become more expensive and are laden with more onerous terms, including liens against drillers' oil and gas assets. The average coupon has increased to 6.84 percent in 2015 from 6.36 percent in 2014, according to data compiled by Bloomberg.

***Some of the bonds issued this year are already trading at levels indicating financial distress, including $1.25 billion issued last month by SandRidge Energy Inc.*** More than $22 billion out of the $235 billion in debt owed by the 62 companies in the Bloomberg North America Independent Explorers and Producers index is trading at distressed levels. ***Their yields are more than 10 percentage points above U.S. Treasuries, as investors demand higher rates to compensate for the risk they won't be repaid.*** [emphasis added]

146.   On July 27, 2015, SandRidge announced that it had received a notice of deficiency from the New York Stock Exchange, that it has fallen below the New York Stock Exchange ("NYSE") continued listing requirement that the average closing price of a listed company's common stock be above $1.00 per share, calculated over a period of 30 consecutive trading days.  SandRidge announced it was exploring available options to regain compliance, including a potential reverse stock split.

147.   On August 5, 2015, the CEO of Chesapeake Energy, SandRidge's peer, stated that he did not expect any significant recovery in oil prices.

148.   On August 6, on the Company's quarterly earnings release, *The Motley Fool* reported, in part:

While these were all pleasant surprises, ***the company has yet to address its core issue, which is its debt***. As of the end of the quarter, net debt was $3.4 billion, up from $3 billion in the year-ago quarter. That said, the company did receive a favorable ruling from the IRS that CEBA Midstream, which is its wholly owned saltwater gathering and midstream subsidiary, does qualify as an MLP. This suggests that an IPO of the subsidiary is on the horizon, which could provide some improvement to its balance sheet. That said, ***the company has a whole lot of work to do, and it's running out of time since oil remains weak and has been growing weaker over the past month.*** [emphasis added]

149.    Similarly, on August 6, 2015, *The Wichita Eagle* (Kansas) reported in an article entitled "Investor skepticism about SandRidge energy intensifies" that:

> SandRidge Energy – one of the largest oil and gas producers in the state – reported a loss of $17.8 million in the second quarter as well as a 37 percent decline in revenue from the year before.
>
> The results didn't reassure skeptical investors, who drove the company's stock down to 50 cents a share on Wednesday.
>
> SandRidge Energy, based in Oklahoma City, has been hammered by the sharp decline in prices, as have all oil and gas production companies. But the markets view it as particularly likely to go bankrupt because of the large amount of debt on its books.
>
> In 2014, SandRidge was the largest oil producer and the second-largest gas producer in Kansas. It is heavily concentrated in drilling horizontal wells in Harper County, southwest of Sedgwick County, as well as a few neighboring counties in Oklahoma.
>
> The company has embarked on a multipronged plan: drastically cut drilling and other expenses, lower the cost of the wells it does drill and increase liquidity to keep the company afloat. The hope is that if the company has enough cash and slows spending enough, it can last until oil prices rebound.

The company also hedged much of its 2015 production and in the second quarter was able to sell its oil for an average price of $79.65, far above the market price. The price of natural gas is far lower.

The company's average price for all of its hydrocarbon products combined – called a barrel of oil equivalent – was $35.68, still $9 per barrel over the market price.

In its Wednesday release, the company said it has actually produced more than it predicted and has continued to lower the cost of its wells, to $2.4 million per well. The company was also successful in issuing new notes in June and ended the quarter with $1.5 billion in liquidity, $984 million of that in cash.

But skeptics note that much of its price hedging expires at the end of the year – meaning the price for its oil and gas will be far closer to the market price – and the debt load is only getting bigger; it's now $4.4 billion.

The fall in stock price reflects that investors increasingly doubt the company's long-term prospects if oil and gas prices remain so low.

150. From the beginning of the Relevant Period through the filing of the instant



Complaint, the Plan's imprudent investments in SandRidge Stock have been decimated:

Source: www.google.com/finance?q=SD

## DEFENDANTS KNEW OR SHOULD HAVE KNOWN SANDRIDGE STOCK WAS IMPRUDENT FOR THE PLAN, YET DEFENDANTS FAILED TO PROTECT PARTICIPANTS

151.   During the Relevant Period, although they knew or should have known that Company Stock was an imprudent investment for the Plan, Defendants did nothing to protect the significant investment of Participants' retirement savings in SandRidge Stock.

152.   As a result of the enormous erosion of the value of SandRidge Stock, the Participants, the retirement savings of whom were heavily invested in SandRidge Stock, suffered unnecessary and unacceptable losses.

153.   Because of their high ranking positions within the Company and/or their status as fiduciaries of the Plan, Defendants knew or should have known of the existence of the above-mentioned problems.

154.   Defendants knew or should have known that, due to the Company's exposure to losses stemming from the problems described above, Company Stock was imprudent no matter what its price.   Regardless, the price of Company Stock inevitably dropped drastically and steadily beginning well before the start of the Relevant Period, and continued throughout the Relevant Period due to the pervasive problems facing the Company.   There was absolutely no objective evidence that the Company Stock price would or could recover.   Yet, Defendants failed to protect the Plan and the Participants from these foreseeable losses.

155.   As a result of Defendants' knowledge of and/or implication in creating and maintaining public and/or Participant misconceptions concerning SandRidge's true financial health, or at least its financial prospects, any generalized warnings of market

and diversification risks that were made to the Participants regarding the Plan's investment in SandRidge Stock did not effectively inform the Participants of the dangers of investing in Company Stock.

156.   In addition, upon information and belief, Defendants failed to adequately review the performance of the other fiduciaries of the Plan to ensure that they were fulfilling their fiduciary duties under the Plan and ERISA.  Defendants also failed to conduct an appropriate investigation into whether SandRidge Stock was a prudent investment for the Plan and, in connection therewith, failed to provide the Participants with information regarding SandRidge's problems so that Participants—to the extent that they were permitted—could make informed decisions regarding whether to include SandRidge Stock in their accounts in the Plan.

157.   An adequate (or even cursory) investigation by Defendants would have revealed to a reasonable fiduciary that investment by the Plan in SandRidge Stock during the Relevant Period was clearly imprudent.  A prudent fiduciary acting under similar circumstances would have acted during the Relevant Period to protect the Participants against unnecessary losses, and would have made different investment decisions.  Either Defendants did not conduct such an adequate investigation (in violation of their duty of prudence) or they did conduct an adequate investigation and ignored the results thereof (in violation of their duty of loyalty).

158.   Because Defendants knew or should have known that SandRidge Stock was imprudent for the Plan during the Relevant Period, they had an obligation to protect the

Plan and its Participants from unreasonable and entirely predictable losses incurred during the Relevant Period as a result of the Plan's investment in SandRidge Stock.

159.    Defendants had available to them several different options for satisfying this duty, including, among other things: divesting the Plan of SandRidge Stock; discontinuing further contributions to and/or investment in SandRidge Stock under the Plan; resigning as fiduciaries of the Plan if, as a result of their employment by SandRidge, they could not loyally serve the Plan and its Participants in connection with the Plan's acquisition and holding of SandRidge Stock; making appropriate public disclosures as necessary; and/or consulting independent fiduciaries regarding appropriate measures to take in order to prudently and loyally serve the Participants of the Plan.

160.    Despite the availability of these and other options, Defendants failed to take any adequate action during the Relevant Period to protect Participants from losses resulting from the Plan's investment in SandRidge Stock, instead standing idly by as the Plan's assets, along with tens of millions of dollars of Participants' retirement savings, were decimated.

## CLAIMS FOR RELIEF UNDER ERISA

161.    At all relevant times, Defendants are/were and acted as fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

162.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. § 1109.

163.    ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

164.    ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) and (B), provide, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants, for the exclusive purpose of providing benefits to participants, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

165.    These fiduciary duties under ERISA §§ 404(a)(1)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence and, as courts have noted, "the duties of prudence and loyalty embodied in [ERISA § 404(a)(2)] have been characterized as the 'highest known to law.'"  *See, e.g.*, *Shannahan v. Dynegy, Inc.*, No. 06-cv-0160, 2006 WL 3227319, at *4 (S.D. Tex. Nov. 6, 2006) (quoting *Sommers Drug Stores Co. Employee Profit Sharing Trust v. Corrigan*, 793 F.2d (5th Cir. 1986)).

166.    These duties entail, among other things:

a.      the duty to conduct an independent and thorough investigation into, and continually to monitor, the merits of all the investment alternatives of a plan;

b.      the duty to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a plan with an "eye single" to the participants' interests, regardless of the interests of the fiduciaries themselves or the plan sponsor;

c.      the duty to disclose and inform, which encompasses: (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants.

167.   ERISA § 405(a), 29 U.S.C. § 1105 (a), "Liability for breach by co-fiduciary," provides, in pertinent part, that:

> [I]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. § 1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

168.   Plaintiff therefore brings this action under ERISA § 502(a) for Plan-wide relief under ERISA § 409(a) to recover losses sustained by the Plan arising out of the

breaches of fiduciary duties by Defendants for violations under ERISA § 404(a)(1) and

ERISA § 405(a).

## COUNT I:
## FAILURE TO PRUDENTLY AND LOYALLY MANAGE THE PLAN'S ASSETS (BREACHES OF FIDUCIARY DUTIES IN VIOLATION OF ERISA §§ 404 AND 405 BY SANDRIDGE, THE INDIVIDUAL DEFENDANTS, AND THE DOE DEFENDANTS)

169.   Plaintiff incorporates the allegations contained in the previous paragraphs

of this Complaint as if fully set forth herein.

170.   At all relevant times, as alleged above, the SandRidge, the Individual

Defendants, and the Doe Defendants (together the "Prudence Defendants") were

fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C.

§ 1002(21)(A), in that they exercised discretionary authority or control over the

administration and/or management of the Plan and/or disposition of the Plan's assets.

171.   Under ERISA, fiduciaries who exercise discretionary authority or control

over management of a plan or disposition of a plan's assets are responsible for ensuring

that all investment options made available to participants under a plan are prudent.

Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are

prudently invested.  The Prudence Defendants were responsible for ensuring that all

investments in the Company's stock in the Plan were prudent.  The Prudence Defendants

are liable for losses incurred as a result of such investments being imprudent.

172.   A fiduciary's duty of loyalty and prudence requires it to disregard plan

documents or directives that it knows or reasonably should know would lead to an

imprudent result or would otherwise harm plan participants.  ERISA § 404(a)(1)(D), 29

U.S.C. § 1104(a)(1)(D).  Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants, nor may it allow others, including those whom they direct, or who are directed by the plan, including plan trustees, to do so.

173.   The Prudence Defendants' duty of loyalty and prudence also obligated them to speak truthfully to Participants, not to mislead them regarding the Plan or its assets, and to disclose information that Participants needed in order to exercise their rights and interests under the Plan.   This duty to inform Participants includes an obligation to provide Participants with complete and accurate information, and to refrain from providing inaccurate or misleading information, or concealing material information, regarding Plan investments/investment options such that Participants can make informed decisions with regard to the prudence of investing in such options made available under the Plan.

174.   The Prudence Defendants breached their duties to prudently and loyally manage the Plan's assets.  During the Relevant Period, the Prudence Defendants knew or should have known that, as described herein, Company Stock was not a suitable and appropriate investment for the Plan.   Yet, during the Relevant Period, despite their knowledge of the imprudence of the investment, the Prudence Defendants failed to take any meaningful steps to protect Participants from the inevitable losses that they knew would ensue as the already-weakened SandRidge faced quarter after quarter of loss as its business model became increasingly difficult and its ultimate demise became more likely.

175.   The Prudence Defendants further breached their duties of loyalty and prudence by failing to divest the Plan of Company Stock during the Relevant Period when they knew or should have known that it was not a suitable and appropriate investment for the Plan.

176.   The Prudence Defendants also breached their duties of loyalty and prudence by failing to provide complete and accurate information regarding the Company's true financial condition and, generally, by conveying inaccurate information regarding the Company's future outlook.  During the Relevant Period, upon information and belief, the Company fostered a positive attitude toward Company Stock, and/or allowed Participants in the Plan to follow their natural bias towards investment in the equities of their employer by not disclosing negative material information concerning the imprudence of investment in Company Stock.  As such, Participants could not appreciate the true risks presented by investments in SandRidge Stock and therefore could not make informed decisions regarding their investments in the Plan.

177.   The Prudence Defendants also breached their co-fiduciary obligations by, among their other failures, knowingly participating in each other's failure to protect the Plan from inevitable losses.   The Prudence Defendants had or should have had knowledge of such breaches by other fiduciaries of the Plan, yet made no effort to remedy them.

178.   As a direct and proximate result of the breaches of fiduciary duties during the Relevant Period alleged herein, the Plan and, indirectly, the Participants lost a significant portion of their retirement investments.  Had the Prudence Defendants taken

appropriate steps to comply with their fiduciary obligations during the Relevant Period, Participants could have liquidated some or all of their holdings in Company Stock and thereby eliminated, or at least reduced, losses to the Plan and themselves.

179.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses (including lost profits) to the Plan caused by their breaches of fiduciary duties alleged in this Count.

**COUNT II:**
**FAILURE TO ADEQUATELY MONITOR AND INFORM OTHER FIDUCIARIES**
**(BREACHES OF FIDUCIARY DUTIES IN VIOLATION OF ERISA § 404 BY SANDRIDGE)**

180.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

181.    At all relevant times, as alleged above, SandRidge was a fiduciary of the Plan, within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).  It was bound by the duties of loyalty, exclusive purpose, and prudence.

182.    To the extent that it chose to designate company personnel to administer the Plan (2015 11-K at 7), the scope of SandRidge's fiduciary responsibilities included the responsibility to appoint, remove, and, thus, monitor the performance of such persons (the "Appointees").

183.    Under ERISA, a monitoring fiduciary must ensure that monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of a plan's assets, and must take prompt and effective action to protect the plan and participants when they are not.

184.    The monitoring duty further requires that appointing fiduciaries have procedures in place so that on an ongoing basis they may review and evaluate whether the "hands-on" fiduciaries are doing an adequate job (for example, by requiring periodic reports on their work and the plan's performance, and by ensuring that they have a prudent process for obtaining the information and resources they need).  In the absence of a sensible process for monitoring their appointees, the appointing fiduciaries would have no basis for prudently concluding that their appointees were faithfully and effectively performing their obligations to the plan's participants or for deciding whether to retain or remove them.

185.    Furthermore, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plan and the plan's assets, or that may have an extreme impact on the plan and the fiduciaries' investment decisions regarding the plan.

186.    During the Relevant Period, SandRidge breached its fiduciary monitoring duties by, among other things:

a.    failing, at least with respect to the Plan's investment in Company Stock, to properly monitor their Appointees, to properly evaluate their performance, or to have any proper system in place for doing so, and standing idly by as the Plan suffered enormous losses as a result of the Appointees' imprudent actions and inaction with respect to Company Stock;

b.      failing to ensure that the Appointees appreciated the true extent of the Company's precarious financial situation and the likely impact that financial failure would have on the value of the Plan's investment in Company Stock;

c.      to the extent any Appointee lacked such information, failing to provide complete and accurate information to all of their appointees such that they could make sufficiently informed fiduciary decisions with respect to the Plan's assets and, in particular, the Plan's investment in Company Stock; and

d.      failing to remove Appointees whose performance was inadequate in that they continued to permit the Plan to make and maintain investments in the Company Stock despite the practices that rendered it an imprudent investment during the Relevant Period.

187.   As a consequence of SandRidge's breaches of fiduciary duty, the Plan suffered tremendous losses.  If SandRidge had discharged their fiduciary monitoring duties as described above, the losses suffered by the Plan would have been minimized or avoided.

188.   SandRidge is liable as a co-fiduciaries because it knowingly participated in each of the Appointees' breaches, it enabled the breaches by those Defendants, and it failed to make any effort to remedy these breaches despite having knowledge of them.

189.   Therefore, as a direct and proximate result of the breaches of fiduciary duty by SandRidge during the Relevant Period alleged herein, the Plan and, indirectly, the Participants, lost tens of millions of dollars of retirement savings.

190.    Pursuant to ERISA §§ 409, 502(a)(2) and (a)(3), 29 U.S.C. §§ 1109, 1132(a)(2) and (a)(3), SandRidge is liable to restore the losses to the Plan caused by its breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## COUNT III:
## FAILURE TO PRUDENTLY AND LOYALLY MANAGE THE PLAN'S ASSETS
## (BREACHES OF FIDUCIARY DUTIES IN VIOLATION OF ERISA §§ 404 AND 405 BY RELIANCE)

191.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

192.    At all relevant times, as alleged above, Defendant Reliance was a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that it exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

193.    Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that all investment options made available to participants under a plan are prudent. Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are prudently invested.  Reliance could not blindly follow directions of the Prudence Defendants if it knew or should have known such directions were improper under ERISA.

194.    A directed trustee's duty of prudence requires it to disregard plan documents or directives that it knows or reasonably should know would lead to an

imprudent result or would otherwise harm plan participants.  ERISA § 404(a)(1)(D), 29

U.S.C. § 1104(a)(1)(D).  Thus, a fiduciary may not blindly follow plan documents or

directives that would lead to an imprudent result or that would harm plan participants, nor

may it allow others, including those whom they direct, or who are directed by the plan,

including plan trustees, to do so.

195.   Reliance breached its duties to prudently and loyally manage the Plan's

assets.  During the Relevant Period, Reliance knew or should have known that, as

described herein, Company Stock was not a suitable and appropriate investment for the

Plan.  Yet, during the Relevant Period, despite its knowledge of the imprudence of the

investment, Reliance failed to take any meaningful steps to protect Participants from the

inevitable losses that it knew would ensue as the already-weakened SandRidge faced

quarter after quarter of loss as its business model became increasingly difficult and its

ultimate demise became significantly more likely.

196.   Reliance further breached its duties of loyalty and prudence by failing to

divest the Plan of Company Stock when it knew or should have known that it was not a

suitable and appropriate investment for the Plan.

197.   Reliance also breached its co-fiduciary obligations by, among their other

failures, knowingly participating in each other's failure to protect the Plan from

inevitable losses.  Reliance had or should have had knowledge of such breaches by other

fiduciaries of the Plan, yet made no effort to remedy them.

198.   As a direct and proximate result of the breaches of fiduciary duties alleged

herein, the Plan, and indirectly the Participants, lost a significant portion of their

retirement investment.  Had Reliance taken appropriate steps to comply with its fiduciary obligations, participants could have liquidated some or all of their holdings in Company Stock and thereby eliminated, or at least reduced, losses to the Plan.

199.   Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendant in this Count is liable to restore the losses to the Plan caused by its breaches of fiduciary duties alleged in this Count.

## CAUSATION

200.   The total SandRidge Stock price collapse of over 96%, which devastated the Plan's assets, and could have and would have been avoided in whole or in part by Defendants complying with their ERISA fiduciary duties.  Defendants could have taken certain actions based on the publicly known information alone such as, and not limited to: investigating whether SandRidge was a prudent retirement investment; retaining outside advisors to consult them or to act as fiduciaries; seeking guidance from governmental agencies (such as the DOL or SEC); resigning as fiduciaries of the Plan; stopping or limiting additional purchases of SandRidge Stock by the Plan; and/or by divesting the SandRidge Stock held by the Plan.

201.   Despite these and other options, Defendants—who knew or should have known that SandRidge was an imprudent retirement investment—chose to, as fiduciaries, continue allowing the Plan to acquire further SandRidge Stock, while taking no action to protect their wards as SandRidge's condition worsened and the Plan Participants' retirement savings were decimated.  Prudent fiduciaries would have acted otherwise and taken appropriate actions to protect the Plan and its Participants.

202.   To the extent Defendants wanted to take action based on non-publicly disclosed information that they were privy to, the following alternative options—which are pled as alternative statements under FED. R. CIV. P. 8(d)(2) to the extent they are inconsistent—were available to Defendants and (a) could have been done without violating securities laws or any other laws, (b) should have been done to fulfill Defendants' fiduciary obligations under ERISA, and (c) would not have been more likely to harm the Plan than to help it.

203.   First, Defendants could have and should have directed that all Company and Participant contributions to the Company Stock fund be held in cash rather than be used to purchase SandRidge Stock.  The refusal to purchase Company Stock for the Company Stock fund is not a "transaction" within the meaning of insider trading prohibitions.  This action would not have required any independent disclosures that could have had a materially adverse effect on SandRidge's stock price.

204.   Alternatively, Defendants should have closed the Fund itself to further contributions and directed that contributions be diverted from the Fund into other (prudent) investment options based upon Participants' instructions or, if there were no such instructions, the Plan's default investment option.

205.   Additionally, because Defendants could and should have concluded SandRidge stock was an imprudent retirement savings vehicle based solely upon public information, no disclosure was required before conducting an orderly liquidation of the Plan's holdings.

206.   Defendants also could have:

- sought guidance from the DOL or SEC as to what they should have done;

- resigned as Plan fiduciaries to the extent they could not act loyally and prudently; and/or

- retained outside experts to serve either as advisors or as independent fiduciaries specifically for the Plan and not the Company in general.

207. The Plan suffered tens of millions of dollars in losses during the Relevant Period because substantial assets of the Plan were imprudently invested, or allowed to be invested, by Defendants in Company Stock during the Relevant Period, in breach of Defendants' fiduciary duties, as reflected in the diminished account balances of the Participants.

208. Had Defendants properly discharged their fiduciary and/or co-fiduciary duties, the Plan and the Participants would have avoided a substantial portion of the losses that they suffered through the Plan's continued investment in Company Stock.

209. Given the totality of circumstances prevailing during the Relevant Period no prudent fiduciary would have made the same decision to retain the clearly imprudent SandRidge Stock as an investment in the Plan.

210. Despite the availability of these and other options, Defendants took no meaningful action during the Relevant Period to protect Participants from losses as a result of the Company Stock's imprudence until it was too late to make any substantial difference.

## REMEDIES FOR BREACHES OF FIDUCIARY DUTY

211.   Because of Defendants' breaches, the Plan suffered significant losses.

212.   ERISA § 502(a), 29 U.S.C. § 1132(a) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109.  Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan…."  Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate…."

213.   With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the Participants in the Plan would not have made or maintained its investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available.  In this way, the remedy restores the values of the Plan's assets to what they would have been if the Plan had been properly administered.

214.   Plaintiff, Participants, and the Plan are entitled to relief from Defendants in the form of: (1) a monetary payment to the Plan to make good to the Plan the losses to the Plan resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (2) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a), 29 U.S.C.

§§ 1109(a) and 1132(a); (3) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (4) taxable costs; (5) interests on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

215.   Each Defendant is jointly and severally liable for the acts of the other Defendants as a co-fiduciary.

## JURY DEMAND

Plaintiff demands a jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests the following relief:

A.     A Judgment that the Defendants, and each of them, breached their ERISA fiduciary duties to the Plan and the Participants during the Relevant Period;

B.     A Judgment compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the Plan would have made if the Defendants had fulfilled their fiduciary obligations;

C.     A Judgment imposing a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as the result of breaches of ERISA;

D.      A Judgment awarding actual damages in the amount of any losses the Plan

suffered, to be allocated among the Participants' individual accounts in proportion to the

accounts' losses;

E.      A Judgment requiring that Defendants allocate the Plan's recoveries to the

accounts of all participants who had any portion of their account balances invested in the

common stock of SandRidge maintained by the Plan in proportion to the accounts' losses

attributable to the decline in SandRidge's stock price;

F.      A Judgment awarding costs pursuant to 29 U.S.C. § 1132(g);

G.      A Judgment awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and

the common fund doctrine; and

H.      A Judgment awarding equitable restitution and other appropriate equitable

monetary relief against the Defendants.

Dated: August 19, 2015

NORMAN & EDEM, P.L.L.C.

 /s/    L. Mark Bonner
Emmanuel E. Edem, OBA #2614
L. Mark Bonner, OBA #14541
127 N.W. 10th St.
Oklahoma City, OK 73103
405-272-0200
405-272-1055 (fax)
lmb@nemw.com

Michael J. Klein (*Pro Hac Application to be filed*)
**STULL, STULL & BRODY**
6 East 45th Street
New York, NY 10017
Telephone: (212) 687-7230
Facsimile: (212) 490-2022
mklein@ssbny.com

*Attorneys for Plaintiff*